McDonald, j.
 

 12Pefendant, Kirk Landry, was originally charged by grand jury indictment with one count of insurance fraud, a violation of La. R.S. 22:1243 (now La. R.S. 22:1924 as renumbered by 2008 La. Acts, No. 415, § 1, effective January 1, 2009). Defendant pled not guilty. The bill of indictment was subsequently amended to allege defendant committed insurance fraud by committing fraudulent insurance acts as defined by La. R.S. 22:1242(l)(a)(ii) and (iv) (now La. R.S. 22:1923(1)(a)(ii) and (iv) as renumbered by 2008 La. Acts, No. 415, § 1, effective January 1, 2009). Defendant was arraigned on the amended bill and entered a plea of not guilty. Defendant proceeded to trial before a jury and was found guilty as charged.
 

 The trial court sentenced defendant to one year at hard labor, suspended, and placed defendant on probation.
 

 Defendant appeals, citing the following as error:
 

 1. The jury erred in returning a guilty verdict, and the District Court erred in denying appellant’s post-verdict motion for judgment of acquittal, because even when viewed in a light
 
 *141
 
 most favorable to the State, there was absolutely no evidence to prove several of the elements of the charged offense, namely:
 

 (a) The State failed to prove that the defendant’s allegedly false statements were made to an insurer, reinsurer, purported insurer or reinsurer, broker, or any agent thei'eof; and
 

 (b) The State failed to prove that the defendant made any “statements” at all as that term is defined by La. R.S. 22:1242(1).
 

 2. The trial court erred in instructing the jury regarding the charged offense, in that the listing of elements provided to the jury was inaccurate and inconsistent with the statutory language; the court erred in refusing to give Defendant’s Requested Special Instruction number 1, which correctly set forth the elements.
 

 |:i3. Even when the conviction is analyzed using the incorrect elements instructed to the jury, no reasonable juror could have found that the State proved each element beyond a reasonable doubt, viewing the evidence in the light most favorable to the prosecution.
 

 4. The trial court erred in refusing to fully admit into evidence Defense Exhibit 4, an e-mail from Insurance Service Office (ISO) representative Ed Straw, which was relied upon by experts for both sides and was a business record of the Property Insurance Association of Louisiana (PIAL), and which specifically addressed the allegedly false statements.
 

 5. The trial court erred in refusing to instruct the jury consistent with Defendant’s Requested Special Jury Instruction numbers 2 and 3 regarding good faith and mistake, where the defense showed that the defendant relied upon the advice of a respected consultant in taking the actions claimed to be criminal.
 

 6.The trial court erred in reading a portion of La. R.S. 22:1405 to the jury in instructions; no part of the statute should have been read, but if any part was read the entire statute should have been read.
 

 We affirm defendant’s conviction and sentence.
 

 FACTS
 

 On September 4, 2001, defendant, who was the Fire Chief of the City of Donald-sonville Fire Department (DFD), sent a letter to Raymond Jacobs, the Mayor of Donaldsonville. The letter addressed the issue of a City Employee Firefighter Support Program that defendant previously requested through a letter dated July 3, 2001. In the September 4 letter, defendant wrote in pertinent part:
 

 I am deeply concerned about our manpower response to emergencies. Our manpower response is at a level in which I would consider a safety issue. I am also concerned about our ability to maintain the positive protection classes we have achieved. One specific area of concern we have identified is “Credit for Company Personnel” (manpower response). Credit for Company Personnel carries a weight of 15 points. In the year 2000 survey the City scored 5.97 points for manpower. This was achieved by averaging 16.5 firefighters at each structure fire alarm. Today, we are averaging less than 8. ^Allowing city employees to train with the fire department and respond to structure fires will supplement the current response.
 

 Despite the concerns expressed by defendant, there is no indication that the
 
 *142
 
 City of Donaldsonville undertook training of City employees for firefighter support. In early 2002, Crystal Thomas, who was the secretary for defendant and also a firefighter, witnessed a meeting between defendant and Tom Cassisa. Cassisa had been retained by the Donaldsonville City Council to assist the DFD in preparing for the PIAL rating process.
 

 According to Thomas, defendant and Cassisa were reviewing fire reports from 2001 that were going to be submitted to PIAL. Thomas overheard Cassisa telling defendant “Kirk, this is going to hurt you, you don’t have enough people on the scene,” and “Kirk, this is going to hurt you, you don’t have enough trucks on the scene.” However, at no time did Thomas hear Cassisa tell defendant to change the reports.
 

 Following the meeting, defendant went back into his office. Approximately ten minutes later, defendant came back out with some books and stated to Thomas that he needed something taken care of. Thomas explained she was busy at the moment and asked whether the assignment could wait. Defendant said it could and went back into his office. Approximately thirty minutes later, defendant came out of his office and told Thomas that he would “take care of it.”
 

 Thomas then observed defendant sit at her computer, open the electronic files containing the fire reports, and over the course of the next hour, alter the fire reports, including adding specific names to each report. According to Thomas, defendant did not have any documents or records in front of him as reference materials, and appeared to be randomly changing lathe reports. Thomas was later instructed by defendant to use these altered reports when providing information to PIAL for the rating process.
 

 The PIAL grading of the DFD conducted in May 2002 reflected a grade of 76.72 (out of 100) for the City, which placed it in a Class 3 protection category, while Fire District 2 (outside City limits) received a grade of 60.39, which placed it in a Class 4 protection category.
 

 James McDonald, a Fire Captain with the DFD, subsequently learned that defendant had changed some of his fire reports without consulting him. McDonald acknowledged this made him angry. At trial, McDonald admitted that he and defendant did not get along, but that defendant’s changing of his
 
 fire
 
 reports caused him great concern, because at that time, the DFD was trying to get more personnel, and defendant’s actions of adding personnel to the reports could make it appear the fire department did not need more firefighters.
 

 After speaking with several local politicians and law enforcement personnel regarding defendant’s actions, McDonald was eventually referred to the Louisiana Insurance Fraud Division of the Louisiana State Police (LSP) by a private attorney. In October 2003, Detective Barry Ward of the LSP Insurance Fraud Unit met with James McDonald and Mike Sullivan, who also was affiliated with the DFD. McDonald and Sullivan alleged that defendant had falsified fire reports in order to get a better rating from PIAL. Ward was able to verify that DFD reports had been altered by comparing the copies McDonald brought him to copies of the same reports on file with the State Fire Marshall’s Office.
 

 Based on his initial investigation, Ward obtained and executed a search warrant at the DFD for documents related to PIAL, fire reports, personnel reports, and other documents related to fire suppression. Ward | ¿was able to determine that twenty-six fire reports from the period of January
 
 *143
 
 2001 until July 16, 2001, had been altered to reflect that more personnel or apparatus responded to an incident as compared to the numbers reported on the fire reports on file at the State Fire Marshall’s Office.
 

 Blaine Rabe, a division manager at PIAL, was accepted as an expert in PIAL ratings. According to Rabe, PIAL performs fire protection and building code gradings. Rabe testified that there are three main areas covered by the fire suppression rating schedules. These areas include communication, fire department (including manpower response), and water supply. Rabe testified that PIAL is not an insurance company, does not sell insurance, does not reinsure, nor is it an insurance broker or agent for any insurer. However, Rabe stated that every insurance company that writes fire insurance in Louisiana is required to be a member of PIAL. The ratings PIAL assigns are communicated to insurance companies that use those ratings to set their premiums.
 

 The State also presented testimony from Doug Hendry, an auditor for PIAL, who conducted the performance rating of the DFD based on their reports submitted in 2002. Hendry testified that the information PIAL receives is confidential and is not directly disseminated to any insurance company. Instead, PIAL publishes the fire ratings of each department. Insurance companies in Louisiana that issue any type of fire coverage are required to be members of PIAL. According to Hendry, PIAL conducts a grading process of all fire departments in Louisiana. This grading process is used by insurance companies to promulgate rates related to fire insurance policies, homeowner’s policies, and commercial fire policies. The classification of each fire department by PIAL is one of the criteria considered by insurers in evaluating the fire protection of a community. LHendry conceded that if the information used to determine the fire department’s classification is based on false information, then the insurance companies using that rating would also be basing their policy rates on false information.
 

 The majority of the evidence presented by the State and disputed by the defense concerned whether personnel and equipment called to the scene of a fire, but cancelled prior to actually arriving at the scene, could be accurately reported as responding to the fire scene on a fire report. The State’s witnesses maintained that for equipment and personnel to be considered as responding to a fire, they must be physically present at the scene. However, the defense presented testimony from several witnesses, including Tom Cassisa, who was accepted as an expert in PIAL grading, that personnel and/or equipment initially called to a fire scene, but cancelled prior to arrival, could be considered as responding to a fire despite never being physically present at the scene. The defense maintained that defendant’s actions of altering fire reports were merely a way to comply with this allowance of the rules.
 

 SUFFICIENCY OF THE EVIDENCE
 

 In defendant’s first and third assignments of error, he argues the jury verdict against him should be reversed. First, defendant asserts that the State failed to prove the elements of the charged offense. Second, defendant argues that even if the incorrect elements of the offense are used, the State failed to prove each element beyond a reasonable doubt.
 

 Standard of Review
 

 A conviction based on insufficient evidence cannot stand, as it violates Due Process.
 
 See
 
 U.S. Const, amend. XIV; La. Const, art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a | sconviction is whether, viewing the
 
 *144
 
 evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 See
 
 La.C.Cr.P. art. 821;
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Ordodi,
 
 2006-0207, p. 10 (La.11/29/06), 946 So.2d 654, 660;
 
 State v. Mussall,
 
 523 So.2d 1305, 1308-09 (La.1988). The
 
 Jackson
 
 standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence.
 
 State v. Patorno,
 
 2001-2585, p. 5 (La.App. 1st Cir.6/21/02), 822 So.2d 141, 144.
 

 Defendant was charged with one count of insurance fraud, which was specified in the charging instrument as a violation of La. R.S. 22:1243. The applicable portion of La. R.S. 22:1243 provides:
 

 A. Any person who, with the intent to injure, defraud, or deceive any insurance company, or the Department of Insurance, or any insured or other party in interest, or any third party claimant:
 

 (1) Commits any fraudulent insurance . act as defined in R.S. 22:1242;
 

 Louisiana Revised Statute 22:1242 provides in pertinent part:
 

 (1) “Fraudulent insurance act” shall include but not be limited to acts or omissions committed by any person who, knowingly and with intent to defraud:
 

 (a) Presents, causes to be presented, or prepares with knowledge or belief that it will be presented to or by an insurer, reinsurer, purported insurer or reinsurer, broker, or any agent thereof, any oral or written statement which he knows to contain materially false information as part of, or in support of, or denial of, or concerning any fact material to or conceals any information concerning any fact material to the following:
 

 (ii) The rating of any insurance policy.
 

 (iv) Premiums paid on any insurance policy.
 

 | ¡[Defendant's initial argument is that the activity he was' charged with, i.e., making false statements in fire reports that were used by PIAL in determining the classification of the DFD, is not a crime under the statute he was charged with violating. Specifically, defendant asserts that the State failed to prove he made false statements to an insurer, reinsurer, purported insurer or reinsurer, broker, or any agent thereof as required by La. R.S. 22:1242(l)(a). According to defendant, the only entity presented with the altered fire reports
 
 [1]
 
 was PIAL, which is a statutorily-created rating organization.
 
 [2]
 
 Defendant points to the testimony of Rabe, Hendry, and Cassisa, all of whom had worked for PIAL and all of whom testified that PIAL was not an insurer, reinsurer, purported insurer, broker or agent thereof.
 

 The interpretation of a statute begins with the language of the statute itself. Louisiana criminal statutes must be given a genuine construction, according to the fair import of their words, taken in them usual sense, in connection with the context,
 
 *145
 
 and with reference to the purpose of the provision. La. R.S. 14:3. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the legislature’s intent. La. C.C. art. 9. When the language of the law is susceptible of different meanings, however, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. La. C.C. arts. 10 & 12;
 
 State v. Skipper,
 
 2004-2137, p. 3 (La.6/2 9/05), 906 So.2d 399, 402-03.
 

 |[nIt is a well-established tenet of statutory construction that criminal statutes are subject to strict construction under the rule of lenity. Thus, criminal statutes are given a narrow interpretation, and any ambiguity in the substantive provisions of a statute as written is resolved in favor of the accused and against the State. The principle of lenity is premised on the idea that a person should not be criminally punished unless the law provides a fair warning of what conduct will be considered criminal. The rule is based on principles of due process that no person should be forced to guess as to whether his conduct is prohibited.
 
 State v. Carr,
 
 99-2209, pp. 4-5 (La.5/26/00), 761 So.2d 1271, 1274.
 

 However, we also note La. R.S. 14:4, which addresses conduct made criminal under several articles, provides as follows:
 

 Prosecution may proceed under either provision, in the discretion of the district attorney, whenever an offender’s conduct is:
 

 (1) Criminal according to a general article of this Code or Section of this Chapter of the Revised Statutes and also according to a special article of this Code or Section of this Chapter of the Revised Statutes; or
 

 (2) Criminal according to an article of the Code or Section of this Chapter of the Revised Statutes and also according to some other provision of the Revised Statutes, some special statute, or some constitutional provision.
 

 In support of arguing that the State failed to meet its burden of proof on each element of the crime of insurance fraud, defendant also points to La. R.S. 22:1416 (now La. R.S. 22:1474 as renumbered by 2008 La. Acts, No. 415, § 1, effective January 1, 2009), which criminalizes providing false information to a rating organization, such as PIAL.
 
 [3]
 

 InWe agree that the evidence adduced at trial did not prove or even suggest defendant directly presented any insurer with the altered fire reports. However, the statute at issue also uses the following language in its definition of fraudulent insurance acts. Specifically, a close reading of La. R.S. 22:1242(( )(a) also provides that “acts or omissions committed by any person who, knowingly and with intent to defraud ... prepares with knowledge or belief that it will be presented to ... an insurer ... any ... written statement which he knows to contain materially false information.... ” (Emphasis added.)
 

 Clearly, the statute prohibits a person who has prepared a statement that he
 
 *146
 
 knows contains materially false information from directly presenting this information to an insurer. However, the statute also prohibits a person from preparing a statement containing materially false information, if it is known or believed that such information will be presented to an insurer. The fact that the person who has prepared the false statement is not the person or entity who presents such information to the insurer is not a required element for conviction under the statute. What is a required element is that the statement containing the false information be prepared with knowledge that it will be presented to an insurer.
 

 In the present case, the State alleged that defendant altered the fire reports to reflect more fire department assets responded to certain fires. Based on the September 4,
 
 2001 letter
 
 from defendant to the mayor, it is evident that defendant was aware that manpower response would directly affect his department’s fire protection classification. As testified by Rabe, | igPIAL’s purpose in rating fire departments is so insurers can determine the amount of premiums for policies in that area. Accordingly, the jury had a reasonable basis to conclude defendant’s act of inflating the manpower response on the fire reports was materially false information that defendant knew would be presented to insurers.
 

 Secondly, defendant argues the State failed to prove he made any “statements” at all as defined by La. R.S. 22:1242(2). In brief, defendant argues that “statement” is a “term of art.”
 

 Louisiana Revised Statute 22:1242(2) provides:
 

 “Statement” includes but is not limited to any notice, statement, proof of loss, bill of lading, receipt for payment, invoice, account, estimate of property damages, bill for services, diagnosis, prescription, hospital or doctor records, test results, x-rays, or other evidence of loss, injury, or expense.
 

 Defendant argues the language of the statute indicates the legislature’s focus is clearly aimed at false claims made with an insurer. According to defendant, the history of the DFD as documented in the fire reports in connection with certain fires does not fall within the definition of the term “statement” in the charged statute.
 

 We disagree. Again, defendant’s assertions of the interpretation of the statute fail to consider the whole statute. First, in defining “statement,” the legislature chose to include statement as a definition, which causes us to consider the most basic definition of such as found in Black’s Law Dictionary. Black’s defines a statement in pertinent part as, “nonverbal conduct intended as an assertion.” Black’s Law Dictionary 1416 (7th ed.1999).
 

 Moreover, we do not find the legislature’s focus in this language to be limited to false claims made with an insurer. Such an interpretation would not take into account the legislature’s encompassing of insurance fraud to |13include instances of false information concerning an application for the issuance of an insurance policy or, as at issue in this case, the rating of any insurance policy.
 
 See
 
 La. R.S.22:1242(l)(a)(i) & (ii).
 

 Accordingly, since we find defendant’s conduct, if proven by the State, would be encompassed by the statute under which he was charged, we now examine the sufficiency of the evidence.
 

 In his third assignment of error, defendant argues the State failed to prove he made any materially false statements. Defendant maintains that the changes he made to reports by adjusting the figures for apparatus and manpower were made in compliance with the rules and suggested
 
 *147
 
 by Cassisa, the consultant. In support of this, defendant points to the fact that PIAL did not provide instructions on their forms; that the information he provided accurately reflected the equipment and manpower dispatched to certain working fires; that the State failed to prove defendant made any statements to anyone in connection with the water shuttle; and that the State failed to prove he acted with the intent to defraud.
 

 Viewing the evidence in the light most favorable to the prosecution, we find the evidence supports the jury’s determination. At the outset, we note that even if defendant were allowed to alter the fire reports to reflect all the equipment and personnel that were dispatched, as opposed to actually being present at the scene of a fire, the record indicates that these reports contained materially false information regarding the fire department’s fire protection classification.
 

 The defense presented evidence through the testimony of Steve Rodrigue, who had spent time working with DFD in his capacity as an Assistant Fire Chief of the Pierre Part Volunteer Fire Department, and Chief Chuck Montero, also of the DFD, that during the time the fires that were the | ^subject of these reports occurred, the standard response of the DFD included a ladder response. A ladder response was explained as two engines comprising a ladder. Both men testified that the first truck on the scene tended to be manned by the three on-duty paid firefighters, while the rest of the standard response (equipment and volunteers or off-duty personnel) would arrive later. Oftentimes, the later-responding personnel and equipment were cancelled before reaching the scene.
 

 However, the testimony of how defendant went about altering the fire reports to supposedly reflect “dispatch” is contradicted by the testimony by Thomas indi-eating that the repoi'ts were altered in a “random” fashion, with defendant not referencing any other records, or any of the fire captains for the DFD, to check for accuracy. The jury could have placed great weight in Thomas’s eyewitness testimony that defendant altered the fire reports soon after meeting with Cassisa, who had indicated that the information in certain reports would “hurt” the DFD in their PIAL rating. Moreover, there were several instances wherein defendant altered the reports to indicate the presence of firefighters who could not possibly have been dispatched to a fire.
 

 The first example of this is State exhibit 3B, which reports a fire response to an incident occurring on January 23, 2001. Thomas is listed as responding to a fire; however, Thomas’s testimony contradicted the fact she was even dispatched, because she was nine months pregnant at the time. The prosecution also showed that De-Wayne Gibson, who had worked for the DFD since January 1989, was reflected as responding to two separate incidents in July 2001. Gibson testified that in July 2001 he was in California for National Guard activities. Another report dated September 1152001 also reflected Gibson’s response to a fire, despite the fact he had begun working for the Gonzales Fire Department in June 2001.
 

 Further, defendant argues that he made no false statements to anyone in regard to the water shuttle. The water shuttle portion of PIAL’s testing accounts for 35 out of a possible 100 grading points to determine a department’s fire rating. Overall scores from 90 to 100 place a fire district in best or Class 1 rating, while 80-89 places a fire district in a second-best or Class 2 rating, and so on to zero. A department’s inability to participate in a water shuttle test would automatically
 
 *148
 
 drop a fire department to a score of 65, or a Class 4 rating.
 

 In arguing the State failed to prove defendant made any false statements to anyone regarding the water shuttle, defendant has attempted to argue that his altered reports (whether false or not) did not contribute to a lower ranking by PIAL. Thus, he asserts the State failed to prove the altered fire reports were “material” to the rating of the insurance policies that would be necessary to satisfy the necessary elements of insurance fraud.
 

 We disagree. The jury apparently concluded that the altered fire reports reflecting a greater presence of firefighters at certain fire scenes were material to the rating of the DFD and the policies issued in the area based on that rating. Although the defendant only altered fire reports and had no dealings with any PIAL representative regarding the water shuttle, his actions clearly affected the water shuttle performed by DFD.
 

 Hendry, who witnessed the water shuttle performed by the DFD, testified that only the average manpower response as reflected on the fire reports submitted by the DFD could participate in the water shuttle. Hendry admitted this was a “loosely applied” rule. However, the State showed that the average manpower response of the DFD on the original reports (not | ^altered by defendant to reflect “dispatched” personnel) reflected an average manpower response of 6.15. The altered reports reflected an average manpower response of 12.
 
 [4]
 
 When the DFD conducted their water shuttle test, they used 17 people.
 

 Hendry testified that despite the loose enforcement of the water shuttle participation rules, he would never have allowed the DFD to use two times the number of people to participate. Hendry testified that using the accurate data of people who were present at the fire scenes would have reduced the number of participants in the water shuttle, making it more likely the department’s water shuttle score would have been lower. Because the DFD Fire District 2’s score was 60.39, any drop
 
 in
 
 score based on the water shuttle would have lowered its rating.
 

 Clearly, the jury determined that defendant’s actions of altering the fire reports to reflect an increased manpower response had resulted in his providing materially false information. The jury concluded the DFD’s rating was material to the ratings and premiums of policies issued in that area. The jury’s conclusion that the altered fire reports reflecting a higher manpower response were material to the policies issued is clearly a factual finding. We cannot say this factual finding is erroneous.
 

 Finally, defendant argues that the State failed to prove he acted with the intent to defraud. Defendant argues that the paperwork provided to Hendry and PIAL at the time of the grading specifically disclosed that he was claiming credit for equipment and trucks that were never physically present at the scene of the fires. Defendant claims that Hendry was provided with a printout entitled “Unit Responses by Incident.” According to this | 17document, it reflects that some apparatus dispatched to a particular fire were “cancelled” as reflected in the column for “Response Code.” Defendant argues that such disclosure clearly negates that he had any intent to defraud when he altered the reports.
 

 
 *149
 
 We disagree. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant.
 
 State v. Cousan,
 
 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390. Due to the difficulty of presenting direct evidence as to the defendant’s state of mind, the trier of fact may infer intent from the facts and circumstances of a transaction and the defendant’s actions. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact.
 
 State v. McCue,
 
 484 So.2d 889, 892 (La.App. 1st Cir.1986);
 
 see also State v. Graham,
 
 420 So.2d 1126, 1127-28 (La.1982).
 

 In examining the evidence under our standard of review, the jury was presented with the September 4, 2001 letter from defendant requesting the Mayor to allow city employees to be trained in fire fighting. Defendant clearly states in this letter that he is concerned about his department’s manpower response to the point it has become a safety issue. Defendant further states in this letter that he is concerned that the fire department’s classification will be negatively affected because of the decrease in available manpower response. Defendant informs the Mayor that previously the DFD scored 5.97 points (out of a possible 15) when it averaged 16.5 firefighters at each structure fire; however, the current average was “less than 8.”
 

 Clearly, there was a basis for the jury to conclude defendant was aware the decreased manpower response was going to affect the fire | ^protection classification of the DFD. Moreover, the jury was presented with testimony from Thomas, who described how after defendant met with Cas-sisa and was informed that manpower and equipment l’eflected on the fire reports would “hurt,” defendant was seen randomly changing the reports (some of which were a year old) to reflect more personnel and equipment responding to fires. Moreover, some of the reports changed by defendant had been drafted by McDonald, who testified that defendant never consulted him prior to changing his reports in order to ensure accuracy.
 

 Viewing this evidence in the light most favorable to the prosecution, we find the evidence supports the jury’s determination that defendant was guilty of this offense. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness.
 
 State v. Johnson,
 
 99-0385, p. 9 (La.App. 1st Cir.11/5/99), 745 So.2d 217, 223,
 
 writ denied,
 
 2000-0829 (La.11/13/00), 774 So.2d 971. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder’s determination of guilt.
 
 State v. Glynn,
 
 94-0332, p. 32 (La.App. 1st Cir.4/7/95), 653 So.2d 1288, 1310,
 
 writ denied,
 
 95-1153 (La.10/6/95), 661 So.2d 464. Further, in reviewing the evidence, we cannot say that the jury’s determination was irrational under the facts and circumstances presented to them.
 
 See State v. Ordodi,
 
 2006-0207, p. 14 (La.11/29/06), 946 So.2d 654, 662.
 

 These assignments of error are without merit.
 

 EXCLUSION OF E-MAIL FROM ED STRAW
 

 In his fourth assignment of error, defendant contends the trial court erred in refusing to allow an e-mail from ISO representative Ed Straw to PIAL auditor Doug Hendry into evidence. Defendant contends that the e-mail discusses the central issue in this case, i.e., whether it was proper to |l0claim credit for fire department assets dispatched to a fire, but can-celled prior to actual arrival at the scene,
 
 *150
 
 because the chief on the scene had determined they were unnecessai’y.
 

 The record reflects that the e-mail at issue was first mentioned during defense counsel’s cross-examination of Rabe. When the e-mail was first mentioned, the prosecutor asked to approach the bench, at which time an off-the-record discussion was held. Shortly thereafter, defense counsel attempted to introduce the e-mail, but the trial court indicated that it would only be marked for identification purposes.
 

 As the State’s brief points out, defendant was given a significant amount of latitude in discussing the e-mail exchange through the entirety of the trial. The record also reflects that defense counsel cross-examined Rabe, Hendry, and Cassisa regarding the e-mail, and discussed the email in both opening and closing statements. Thus, defendant was only limited to utilizing the e-mail insofar as its publication to the jury was concerned. During closing arguments, the trial court reminded defense counsel that the contents of what Straw had discussed with Hendry were introduced through verbal testimony, and that defense counsel was free to argue anything relating to what came out in open court.
 

 Despite defendant’s contentions regarding the authority of the Straw e-mail, the State introduced evidence from Rabe and Hendry, who both testified that Louisiana does not always adhere to ISO’s rules. That testimony, coupled with the fact that fire department grading is conducted in Louisiana by PIAL, as opposed to ISO, directly affected the relevancy of an e-mail exchange between representatives of ISO and PIAL, regarding the opinion of what constituted a dispatch.
 

 LoUnder these circumstances, we cannot see how the trial court’s refusal to admit the e-mail into evidence was error. This assignment of error is without merit.
 

 FAILURE TO PROVIDE SPECIAL JURY INSTRUCTIONS
 

 In defendant’s second assignment of error, he contends the trial court erred in instructing the jury regarding the charged offense, in that the listing of elements provided to the jury was inaccurate and inconsistent with the statutory language; and the trial court erred in refusing to give Defendant’s Special Jury Instruction Number 1, which correctly set forth the elements.
 

 Defendant specifically argues the trial court failed to instruct the jury on the requirement that the false statements, be made to an insurer, reinsurer, purported insurer, broker, or any agent thereof. Defendant further argues the instructions omitted the requirement that the false statements must be material to the ratings of an insurance policy or material to the premiums charged on an insurance policy, as opposed to merely material to ratings and premiums.
 

 Louisiana Code of Criminal Procedure article 807 provides in pertinent part, “A requested special jury charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.”
 

 Defendant’s requested Special Jury Instruction No. 1 provided:
 

 The elements of insurance fraud are as ' follows:
 

 1. That the defendant presented, caused to be presented, or prepared with knowledge or belief that it will be presented, any oral or written statement;
 

 2. That the defendant knew this statement to contain materially false information;
 

 | g13. That the statement was presented to an insurer, reinsurer, purported in
 
 *151
 
 surer or reinsurer, broker, or any agent thereof;
 

 4. That the statement was presented as part of, or in support of, or denial of, or concerning any fact material to or concealing any information material to, the rating of any insurance policy, or the premiums paid on any insurance policy. The term “statement” includes but is not limited to any notice, statement, proof of loss, bill of lading, receipt for payment, invoice, account, estimate of property damages, bill for services, diagnosis, prescription, hospital or doctor records, test results, x-rays, or other evidence of loss, injury, or expense.
 

 The transcript of the trial court’s jury charges reflects the trial court included the following in its charges to the jury:
 

 A fraudulent insurance [act] shall include but not be limited to acts or occasions committed by any person who knowingly and with intent to defraud presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, reinsurer, purported insurer or reinsurer, broker or any agent thereof any oral or written statement which he knows to contain materially false information as part of or in support or denial or concerning any fact material to or conceal any information concerning any fact material to the following; the rating of any insurance policy or premiums paid on any insurance policy.
 

 The trial court went on to provide a verbatim reading of the definition of statement as found in La. R.S. 22:1242(2) and defendant’s requested jury instruction.
 

 Because we find the information contained in Defendant’s Requested Special Jury Instruction Number 1 was, in fact, contained in the trial court’s general charges to the jury, we find this assignment of error to be without merit.
 

 GOOD FAITH AND MISTAKE OF FACT
 

 In defendant’s fifth assignment of error, he argues the trial court erred in refusing to provide the jury with his special jury instructions pertaining to good faith reliance on a third party and a mistake of fact. Defendant contends that a central theme of the defense was that he acted in good faith 12aand followed the advice of Cassisa, who had been hired by the City to consult with him in the PIAL grading process. Further, defendant maintains that even if his actions were “wrong,” they were committed under a mistaken belief that they were proper.
 

 In support of this theory, defendant submitted Requested Special Jury Instruction Number 2, which provided:
 

 Because the crime of insurance fraud requires that the defendant act knowingly and with the intent to defraud, a defendant’s good faith is a complete defense to the charge. If you find that the defendant reasonably and in good faith relied upon the advice of a consultant, you may find that his reliance precludes the formation of the required mental element. Likewise, the defendant’s reasonable ignorance of fact, or reasonable mistake of fact, which precludes the presence of the mental element required is a defense to the charge.
 

 Authority:
 
 Williamson v. United States,
 
 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278; La. R.S. 14:16.
 

 Mistake of fact is a defense where the reasonable mistake of fact precludes the presence of any mental element required in that crime. La. R.S. 14:16;
 
 see State v. Converse,
 
 529 So.2d 459, 465 (La.App. 1st Cir.),
 
 writ denied,
 
 533 So.2d 355 (La.1988).
 

 Defendant contends that this charge should have been given to the jury because
 
 *152
 
 of the testimony presented that the consultant, Cassisa, advised him to change the reports to indicate how many fire department assets had been dispatched and can-celled before arrival at the scene. Defendant argues that this reliance on Cassisa’s advice precluded the intent necessary to satisfy the elements of the crime.
 

 We disagree. First, we note that at no time did Cassisa testify that he advised defendant to alter any of the fire reports as was done in this case. Second, we note that the general charge instructed the jury as to the requisite knowledge and intent needed for the crime, and the additional charge would Rnhave been redundant.
 
 See State v. Williams,
 
 471 So.2d 255, 261 (La.App. 1st Cir.),
 
 writ denied,
 
 475 So.2d 1102 (La.1985).
 

 Accordingly, this assignment of error is without merit.
 

 READING OF A PORTION OF La. R.S. 22:1405
 

 In defendant’s final assignment of error, he argues that the trial court erred in reading a portion of La. R.S. 22:1405, which is the statute creating PIAL. Defendant contends that reading this portion of the statute allowed the State to suggest that PIAL was in some way an insurer itself, and that only a portion of the statute was read.
 

 After reviewing the trial court’s instructions to the jury, we find the trial court explained that every insurance company writing policies in this state must adhere to the rules promulgated by PIAL. The trial court went on to instruct the jury as to the purpose of the creation of PIAL; how insurance companies had to adhere to the rates promulgated by PIAL; and that changes in fire protection classification in an area could result in adjusted premiums for polices in the area affected.
 

 We do not find the trial court’s instructions in any way suggested that PIAL was an insurance company. Rather, we find the trial court accurately instructed the jury on the purpose and role of PIAL regarding fire protection classifications and insurers.
 

 We agree with the State’s contention that it was unnecessary to read the entire language of La. R.S. 22:1405, because of the length of the statute. Rather, given the circumstances of this case, it was necessary for the jury to have an understanding of what PIAL is and its role as far as fire departments and insurance companies. Further, defense counsel was clearly able to present evidence that PIAL was, in fact, not an insurance company.
 

 This assignment of error is without merit.
 

 J^CONVICTION AND SENTENCE AFFIRMED.
 

 [1]
 

 . Defendant maintains the fire reports reviewed by PIAL are not false.
 

 [2]
 

 .
 
 See
 
 La. R.S. 22:1405 (now La. R.S. 22:1460 as renumbered by 2008 La. Acts, No. 415, § 1, effective January 1, 2009.)
 

 [3]
 

 . Louisiana Revised Statute 22:1416 provides: No person or organization shall willfully withhold information from or knowingly give false or misleading information to the commission ... any statistical agency designated by him, any rating organization, or any insurer which will affect the rates or premiums chargeable under this Part. A violation of this Section shall subject the one guilty of such violation to the penalties provided for violation of this Part.
 

 [4]
 

 . The September 4, 2001 letter from defendant to the Donaldsonville Mayor indicated the DFD average response to a fire was “less than 8” as opposed to an average response in 2000 of 16.5 firefighters at a scene.