Judgment rendered November 20, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 992,
La. C. Cr. P.

No. 52,417-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                     Appellee

versus

ANTHONY SCOTT TUBBS                    Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 209,089

Honorable Parker Self, Judge

* * * * *

FLOWERS, LONG & HATCH, LLP             Counsel for Appellant
By: Christopher Hatch

J. SCHUYLER MARVIN                     Counsel for Appellee
District Attorney

JOHN MICHAEL LAWRENCE
Assistant District Attorney

* * * * *

Before PITMAN, GARRETT, and STEPHENS, JJ.

**GARRETT, J.**

The defendant, Anthony Scott Tubbs, was convicted of insurance fraud. He was ordered to serve five years at hard labor, with all but one year suspended. He was placed on four years' active, supervised probation and ordered to pay a fine of $1,500, along with restitution. He appeals his conviction and sentence. For the following reasons, we affirm.

**FACTS**

Tubbs operated ASAP Appliances ("ASAP") in Bossier City, Louisiana. The business sold and repaired used appliances. Richard Hayden was an employee. On Saturday, May 12, 2012, the vehicles driven by Hayden and Tubbs were parked in a lot behind the business. As Hayden was leaving, he backed his Ford Expedition into a Dodge Ram 3500 truck which was being used that day by Tubbs.[1] Tubbs told the police officers who responded to the accident that he was getting into his vehicle when the accident occurred. Hayden later delivered a typed and signed statement to the police taking full responsibility for the accident and stating that Tubbs was entering his vehicle when the accident occurred.

At the scene, Tubbs said he was not injured, but asked for paramedics to check him out because he had recently had a medical procedure. Tubbs later claimed that he was seriously injured in the accident and filed a civil lawsuit against Hayden, State Farm and USAA. State Farm later settled the claim with Tubbs for $8,500. Tubbs also claimed to have been involved in

---

[1] Hayden's vehicle was owned by Donald Leaver, a relative of Hayden's girlfriend at the time. The vehicle was insured by USAA Insurance Company ("USAA"). The vehicle being used by Tubbs was registered to Oris R. Corners and was insured by State Farm Insurance Company ("State Farm"). That vehicle was a large truck known as a "dually." It had four wheels on the rear, two on each side. Tubbs also alleged that State Farm was his uninsured/underinsured motorist insurer.

separate, unrelated accidents with other drivers on May 28, 2012, and June 29, 2012, and received settlements from State Farm in those cases as well. According to hospital records, the accident on May 28, 2012, occurred when Tubbs was traveling in his truck at a low rate of speed and was impacted on the passenger side by another vehicle. The accident on June 29, 2012, occurred when Tubbs claimed he was rear-ended in traffic by another vehicle. Tubbs settled the second and third accidents with State Farm for $10,494.18 and $10,592.04, respectively.

Tubbs's insurance claims were eventually investigated by the insurance fraud and auto theft unit of the Louisiana State Police. Hayden changed his version of the events concerning the May 12 accident and said that Tubbs was actually inside the business at the time the collision occurred. In early 2015, Tubbs was charged with one count of insurance fraud in connection with this accident. He was tried by a six-person jury. On March 21, 2017, Tubbs was found guilty as charged. He filed motions for new trial and for post verdict judgment of acquittal, which were denied by the trial court on October 17, 2017.

On November 21, 2017, Tubbs was sentenced to serve five years at hard labor, with all but one year suspended. He was given credit for time served. He was placed on four years' active, supervised probation and ordered to pay a fine of $1,500, along with restitution to State Farm in the amount of $8,500. Tubbs stated his intent to appeal.

After some procedural maneuvering, Tubbs filed a second motion for new trial and sought an evidentiary hearing to supplement the record. The trial court denied the second motion for new trial as untimely. Tubbs now appeals, claiming there was insufficient evidence to support his conviction,

the trial court erred when it denied his first motion for new trial, and the sentence imposed was excessive.[2]

## SUFFICIENCY OF THE EVIDENCE

Tubbs argues that the evidence adduced at trial was insufficient to support his conviction for insurance fraud. This argument is without merit.

### Legal Principles

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 2001-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Hughes*, 2018-0006 (La. 6/26/19), ___ So. 3d ___, 2019 WL 2750945; *State v. Turner*, 52,510 (La. App. 2 Cir. 4/10/19), 267 So. 3d 1202, *writ denied*, 2019-00873 (La. 9/24/19), ___ So. 3d ___, 2019 WL 4884059. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. *State v. Pigford*, 2005-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 2009-0310 (La. 11/6/09), 21 So. 3d 297; *State v. Turner*, *supra*.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. Direct evidence provides proof of the existence of

---

[2] Tubbs has chosen not to challenge the trial court's ruling that the second motion for new trial was untimely. Tubbs is represented by different counsel on appeal.

a fact, for example, a witness's testimony that he saw or heard something. *State v. Turner*, *supra*; *State v. Wooten*, 51,738 (La. App. 2 Cir. 2/13/18), 244 So. 3d 1216. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Turner*, *supra*.

Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Turner*, *supra*; *State v. Walker*, 51,217 (La. App. 2 Cir. 5/17/17), 221 So. 3d 951, *writ denied*, 2017-1101 (La. 6/1/18), 243 So. 3d 1064.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Turner*, *supra*. The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Turner*, *supra*. A reviewing court accords great deference to the factfinder's decision to accept or reject the testimony of a witness in whole or in part. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if

4

believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Turner*, *supra*; *State v. Payne*, 52,310 (La. App. 2 Cir. 1/16/19), 262 So. 3d 498.

Regarding automobile insurance policies, La. R.S. 22:1925 states, in part:

> A. (1) Any person who with an intent to injure, defraud, or deceive any insurance company commits any of the acts specified in Paragraph (2) of this Subsection is guilty of a felony and shall be subjected to a term of imprisonment, with or without hard labor, not to exceed five years or a fine not to exceed five thousand dollars, or both, and payment of restitution to the victim company of any insurance payments to the defendant that the court determines were not owed and the costs incurred by the victim company associated with the evaluation and defense of the fraudulent claim, including but not limited to the investigative costs, attorney fees, and court costs. However, mere possession of a fraudulent proof of insurance card or document shall be punishable by a fine of five hundred dollars, imprisonment for not more than six months, or both.
>
> (2) The following acts shall be punishable as provided in Paragraph (1) of this Subsection:
>
> . . . .
>
> (c) Engaging in any of the actions or activities described in R.S. 22:1924, relative to insurance policies in general.

Regarding insurance policies in general, La. R.S. 22:1924 (A)(2)(c) provides, in relevant part:

> (2) The following acts shall be punishable as provided in Paragraph (1) of this Subsection:
>
> . . . .
>
> (c) Assisting, abetting, soliciting, or conspiring with another to prepare or make any written or oral statement that is intended to be presented to any insurance company, insured, the Department of Insurance, or other party in interest or third-party claimant in connection with, or in support of or denial, or any claim for payment of other benefit pursuant to an insurance policy, knowing that such statement contains any false,

5

incomplete, or fraudulent information concerning any fact or thing material to such claim or insurance policy.

**Testimony and Evidence**

At trial, the jury heard live testimony from six witnesses. Numerous exhibits were introduced, which included the dash camera video depicting the scene after the police responded; a demand letter sent on June 4, 2012, on Tubbs's behalf to State Farm; the typed statement signed by Hayden; the police department private property accident report; the petition for damages that Tubbs filed against USAA, Hayden, and State Farm; the receipt and release form regarding the settlement with State Farm; and medical records.

The first witness was Senior Trooper Lawrence Hartsfield of the Louisiana State Police. Trooper Hartsfield is an investigator with the insurance fraud and automobile theft unit. He began investigating this matter in April 2013. He examined the police report, the police dash camera video, and the statement signed by Hayden. Trooper Hartsfield also examined the records from USAA and State Farm and took a statement from Hayden. The record shows that Tubbs claimed to have been involved in automobile accidents, with bodily injury, on May 12, 2012, as well as May 28, 2012, and June 29, 2012. Trooper Hartsfield noted that the police dash camera video taken at the scene shortly after the accident in this matter showed a minor, low impact collision with minor damage to the rear of both vehicles caused by a backing maneuver. In spite of the minor nature of the accident, Tubbs claimed to have been seriously injured. Trooper Hartsfield examined the statement submitted to the police by Hayden and noted that on February 14, 2013, Tubbs filed a civil lawsuit against Hayden, USAA, and State Farm arising from this accident. In the suit, Tubbs claimed he was on

6

the running board, getting into his vehicle when Hayden backed into his vehicle at a high rate of speed. He claimed that he suffered serious, painful, and permanent injury requiring medical treatment. State Farm settled with Tubbs for $8,500 on October 29, 2014. Trooper Hartsfield turned the matter over to the district attorney's office in December 2014.

Detective Tina Smith of the Bossier City Police Department testified that she was a patrol officer in 2012, and responded to the scene of this accident. The dash camera in her vehicle was activated and recording when she responded to the scene. The dash camera video was submitted into evidence. It shows very minor damage to the rear of both vehicles. Tubbs is seen on the video and can be heard telling the officers that he was not injured, but stated he wanted to be "checked out" because he had recently had some medical issues.

Hayden testified that he is an electrician and was working for Tubbs at the time of the accident. He repaired appliances and made deliveries. Hayden admitted that he had prior criminal convictions for misdemeanor carnal knowledge of a juvenile, possession of Schedule IV controlled dangerous substances, and burglary.

Hayden said that Tubbs would occasionally do some manual labor and that he complained about his back on a daily basis. According to Hayden, on the date of the accident, he was leaving the business in his girlfriend's vehicle when he rear-ended Tubbs's vehicle. Hayden stated that Tubbs was inside the business at the time the accident occurred. Hayden went inside and told Tubbs about hitting the vehicle; they went outside to inspect the damage. Hayden testified that Tubbs gave him two options. The first was to "go with the story." The second was to find a new job. When the police

7

arrived, Hayden told them he rear-ended Tubbs's vehicle. Hayden could not remember if he said that Tubbs was in the vehicle at the time of the collision. Hayden also said that, at one point, Tubbs offered him several thousand dollars to provide the false statement.

Hayden identified the typewritten letter he signed and submitted to the Bossier City Police Department.[3] Hayden said he did not write the letter. He claimed it was written by Tubbs. Hayden stated that he cannot type and

---

[3] The letter was signed and dated by Hayden. The content of the letter is as follows, verbatim:

Accident Report

Personal Statement

I Richard Hayden on May 12, 2012 was departing my place of employment located at 2056 E. Texas St. Bossier city Louisiana 71111 I was driving my girlfriends Ford expedition Natalie Leaver is the owner of said vehicle my supervisor Scott Tubbs was also leaving at the same time I had entered my vehicle and started to back out as Mr. Tubbs was entering his vehicle no other vehicles were in the parking lot at the time that is why I believed the parking lot was clear for me to be backing up at a higher rate of speed than normal the back right of the vehicle I was driving struck the back of Mr. Tubbs's vehicle I'm not sure if he was getting into the vehicle or just set down in the vehicle at the time of the collision as I exited the vehicle I noticed Mr. Tubbs was getting up off of the ground I quickly came to his aid he appeared to be okay however shaken up a great deal we decided to call the Bossier city fire department because Mr. Tubbs was knocked out of his vehicle during this collision Mr. Tubbs advise me he just had a procedure done a week ago to date at Christus Schumpert medical center in Shreveport Louisiana for a low hemoglobin due to a bleed somewhere in his intestines. Mr. Tubbs felt dizzy and was scared so he felt it necessary to get his vital signs checked out by EMS they took his blood pressure twice I overheard on both occasions it was high probably due to the high stressful situation he just encountered I apologized many times and feared I might lose my job and offered to pay if able for any damages or medical expenses to the best of my ability I admit I was not paying attention when backing out and that I high rate of speed I did advise a Bossier city police officer when questioned that I didn't think I was backing up that quick but I was also scared in closing I accept responsibility for being careless and not looking where I was backing as well as backing up too fast the last I spoke with Mr. Tubbs he was not feeling well however was somewhat afraid to go to the emergency room even though he was advised to do so later on that evening I spoke with his wife Kelly and apologize to her for not paying attention and at that time I believe that she may have demanded he go get checked out due to the recent procedure he recently had just a week ago, I personally believe I have taken responsibility 100% by giving my account of what happened in the above question accident

Richard Hayden

Case #12-5946

Bossier City Police Department

8

does not own a typewriter. Hayden was asked to read the letter in court. He had difficulty reading and pronouncing some of the words. At the point in the letter in which Tubbs's low hemoglobin was discussed, Hayden could not pronounce the word "hemoglobin" and stated that he did not know what that was. Hayden acknowledged that he signed and dated the letter and delivered it to the police department. Hayden only worked for Tubbs for a short time after the accident. Tubbs filed a civil lawsuit against Hayden based upon the accident.

In connection with the civil lawsuit, Hayden said he gave a deposition in which he stated that Tubbs was not in the vehicle at the time the accident occurred. He claimed that his deposition testimony and his trial testimony in this case contained the true version of the accident. Hayden stated that he had not been offered any deal, compensation, or plea bargain by the district attorney's office in exchange for his testimony.

At the time of the trial, Hayden was 28 years old and had a tenth-grade education. He did not remember if he went to the Tubbs residence the evening of the accident to apologize to Mrs. Tubbs. Hayden did not recall who called the police after the accident. He also stated that he did not know whether Tubbs had undergone a medical procedure prior to the accident. Hayden stopped working for Tubbs several months after the accident because they had an argument and a "falling out." Hayden admitted that he gave two versions of how the accident occurred, but stated that his trial testimony was the true version.

Officer Stephen Boothe of the Bossier City Police Department made a Private Property Accident Report in this matter. The document was prepared for insurance purposes. If there had been a report of injuries,

Officer Boothe would have prepared an Accident Report form. Officer Boothe stated that he got the information for the report from Hayden. The time on the report is 1914, which would be 7:14 p.m. Hayden told him that he backed into Tubbs's vehicle, but that both drivers were okay. The officer observed minor damage to the rear of both vehicles. There were no reports of injury, but Tubbs said he had recently had a medical procedure and wanted to be checked out by the Bossier City Fire Department.

The state introduced into evidence some of Tubbs's medical records. Other medical records were introduced by Tubbs. The records of Dr. James Wiseman, a chiropractor, showed that Tubbs consulted him in April 2010, with neck and back pain. His x-rays showed thinning at the L4-L5 and L5-S1 levels of the spine, but there was no disc injury or annular tears. Dr. Wiseman observed that, after the present accident, Tubbs was diagnosed with a significant disc injury that was not present in 2010.

In early May 2012, Tubbs had an endoscopy and a colonoscopy.

On the date of the accident, at 9:41 p.m., Tubbs went to the emergency room complaining of back pain. He claimed his vehicle was hit by another vehicle, he fell out of his truck, and landed on his back. An x-ray showed a normal thoracic spine. He was diagnosed with back strain and a back contusion. He was discharged with medication at 11:07 p.m.

After the second auto accident, which occurred on May 28, 2012, Tubbs went to the emergency room. His lumbar spine x-ray was compared to the x-ray made on May 12, 2012. No fractures or bone destruction were observed.

Tubbs went to the emergency room after the third accident, on June 29, 2012, complaining of acute neck pain and muscle strain. A CT scan of the cervical spine did not show any fractures or dislocations.

After the accident in this case, Tubbs was treated by Dr. Rodney Crews, a chiropractor. His first visit was on May 24, 2012. He told Dr. Crews that he went to the emergency room after the accident. He claimed that, later that night, he awoke to go to the restroom and had a "dead leg" with extreme numbness and tingling which radiated to his foot. An MRI was done on May 25, 2012. This test showed, at the L4-L5 level, a moderate central disc bulge or herniation with an annular tear and moderate compression of the thecal sac. The L5-S1 level showed a small central disc bulge without nerve root impingement or displacement. These were the same areas treated by Dr. Wiseman in 2010. After the accident on May 28, 2012, Dr. Crews recommended a neurosurgical consultation.

Tubbs also saw Dr. Richard Kamm, a medical doctor, after the first two accidents. His first visit was on June 5, 2012. Tubbs described the accident in this case, stating that he had one foot on the step of the vehicle and one hand on the steering wheel, when the other car backed into his vehicle. The records reflect that Tubbs claimed he was knocked out of his truck onto the ground where he landed on his buttocks and back. He reported that he then did a backward flip and jumped up with the assistance of the other driver. Tubbs claimed he began to suffer back and neck pain after the accident in this case. On June 7, 2012, an x-ray of Tubbs's cervical spine showed degenerative disc disease.

Tubbs had a follow-up appointment with Dr. Kamm on July 18, 2012. Tubbs saw Dr. Kamm again on August 1, 2012, and received prescriptions

for pain and anxiety. On August 29, 2012, Tubbs informed Dr. Kamm that he would not be returning for any more visits.

Tubbs saw Dr. Marco Ramos for a consultation on July 2, 2012. Dr. Ramos suggested physical therapy with a reevaluation after treatment. On August 28, 2012, Dr. Ramos recommended surgery.

On October 8, 2012, Tubbs had an initial consultation with Dr. Pierce Nunley at the Spine Institute of Louisiana. Tubbs complained of neck and leg symptoms since the accident in this case, and neck and arm symptoms since the second accident on May 28, 2012. Regarding the accident in this case, Tubbs said he was trying to get into his vehicle when he was rear-ended. He said he "essentially flipped over backwards landing on concrete on his back." The MRI of Tubbs's back taken on May 25, 2012, discussed above, was reviewed. At a visit on November 8, 2012, Dr. Nunley found that Tubbs was not a candidate for surgery and recommended back injections to treat the symptoms.

Tubbs saw Dr. Ramos on August 28, 2013, and September 19, 2013. At that point, Dr. Ramos opined that the first accident caused Tubbs's problems with his spine. An MRI taken on August 27, 2013, showed lumbar spondylosis, worse at L4-L5 bilaterally and L5-S1 on the left.

In March 2014, Tubbs decided to have surgery with Dr. Ramos. On March 28, 2014, a minimally invasive left laminectomy and microdiscectomy was performed at the L4-L5 and L5-S1 levels. Tubbs was discharged from the hospital on March 29, 2014. He went to the emergency room on March 31, 2014, claiming he fell at home. Dr. Ramos's notes on April 10, 2014, indicate that Tubbs was recovering normally.

After the conclusion of the state's case, the defense made a motion for a directed verdict of acquittal, arguing that the state failed to provide sufficient evidence of the elements of the crime of insurance fraud to sustain a verdict of guilty against Tubbs. The trial court denied the motion.

The defense then presented its case. Tubbs did not testify, but called two witnesses and introduced additional medical records and a receipt and release from State Farm. Kelly Tubbs testified that she had been married to Tubbs for 20 years and she was the owner of ASAP. She stated that her cousin, Tara Pilcher, managed the business. Mrs. Tubbs testified that, on the day of the accident, Hayden called at 5:45 p.m. to see if Tubbs would lend him $100 to take his girlfriend out to eat for Mother's Day, which was the next day. Mrs. Tubbs told him that Tubbs was at the business and to call and ask him. Later, Tubbs called his wife and told her about the accident. Tubbs said that Hayden was "acting crazy," backed up "real fast," hit Tubbs's vehicle, and knocked him out of it. Tubbs said the paramedics had left, he was okay, and would be home in a little while.

Mrs. Tubbs testified that she called Ms. Pilcher to come to her house and watch her children so she could take Tubbs to the hospital and make sure that he was alright. Mrs. Tubbs said that Hayden came to the house that evening after they returned from the emergency room. He brought a letter admitting his fault. She glanced at the letter and gave it back to Hayden. When shown the letter admitted into evidence, Mrs. Tubbs said it looked like the letter Hayden presented to her. According to Mrs. Tubbs, Ms. Pilcher was present when Hayden arrived. Mrs. Tubbs said she would not have fired Hayden because of an accident, but that he was fired three to four months later for improperly touching someone at the business.

13

On cross-examination, Mrs. Tubbs said her husband did not have back problems prior to this accident and she was unaware of his medical history indicating that he had been treated for back pain in 2010. Mrs. Tubbs said she did not know how Hayden prepared the letter and was not sure if he ever used the computer at work. She claimed that Hayden said that he prepared the letter himself. Mrs. Tubbs acknowledged that her husband filed lawsuits in connection with all three accidents and received payment from State Farm for all of them. She stated that the money either went into the business account or her account.

Ms. Pilcher testified that her former husband was Mrs. Tubbs's cousin. Ms. Pilcher said that she occasionally worked at ASAP. On May 12, 2012, she was shopping for Mother's Day when Mrs. Tubbs called her to babysit so she could take Tubbs to the hospital. According to Ms. Pilcher, after they returned from the hospital, Hayden arrived and handed Mrs. Tubbs a letter. Mrs. Tubbs gave the letter back to Hayden. Ms. Pilcher said she did not know who prepared the letter.

Hayden testified on rebuttal. He said he first saw the letter the day after the accident and it was prepared by Tubbs. Hayden said he did not remember taking the letter to the Tubbs's house. He denied borrowing $100 from Tubbs and reiterated that he quit his job sometime after the accident. He was asked whether he had ever gotten angry at the business or at a customer's house and damaged a refrigerator or a door. He denied that happened.

## Discussion

Tubbs contends there is insufficient evidence to support his conviction for insurance fraud. He claims that Hayden's testimony was so unreliable

14

and internally contradictory that deference should not be given to the jury's determination that the testimony was credible. Also, Tubbs claims that, because the state failed to introduce into evidence a copy of the insurance policy or present a witness from the insurance company to prove that the statement signed by Hayden was presented to the insurance company, an essential element of the crime of insurance fraud was not proved.

Based upon our examination of the record, we reject the argument that Hayden's testimony was insufficient to support the conviction in this case. Hayden took the written statement discussed above to the police department. However, he testified at trial that the statement was not true and that he initially gave that version of the accident because Tubbs threatened to fire him if he did not "go with the story." Hayden stated that Tubbs was inside the business when the accident occurred. Hayden gave a deposition in the civil trial to that effect and testified at trial in this case that the statement to the police and the contents of the written statement were not true. Hayden said that he could not type and the letter was written by Tubbs. At trial, Hayden was asked to read the letter aloud. He had marked difficulty pronouncing words contained therein. Hayden did not know what "hemoglobin" was. The letter exhibits a great deal of familiarity with Tubbs's medical history that would not ordinarily be expected of an employee. Also, the letter states that Hayden went to the Tubbs's residence the evening of the accident and apologized to Mrs. Tubbs. If, as Mrs. Tubbs testified at trial, the letter was presented to her that evening after the accident, it would be unusual for it to contain information about their conversation. Tubbs was discharged from the emergency room at 11:07 p.m. If Hayden had actually gone to the Tubbses' residence after they

15

returned from the emergency room, as stated by Ms. Tubbs, the encounter would have occurred very late at night.

Tubbs claims that Hayden's trial testimony should be equated with recanted trial testimony and should be discredited, citing *State v. Guidry*, 94-678 (La. App. 3 Cir. 12/7/94), 647 So. 2d 502, and *State v. Linkletter*, 345 So. 2d 452 (La. 1977), *cert. denied*, 434 U.S. 1016, 98 S. Ct. 733, 54 L. Ed. 2d 760 (1978). In *Linkletter*, a witness testified that the defendant was her accomplice in a burglary and he was convicted. Later, the witness told defense counsel that she perjured herself and her trial testimony was not true. The trial court denied a motion for new trial based upon the recantation. The supreme court stated that recantations of trial testimony should be looked upon with the utmost suspicion and found that the recantation was a confession to perjury which destroys the credibility of the witness. In *Guidry*, the defendant was convicted of the aggravated rape of his minor daughter. A motion for new trial was denied after the child recanted her trial testimony. The court cited *Linkletter*, and refused to give any weight to the recanted testimony.

The cases of *Linkletter* and *Guidry* are distinguishable from the facts of this case. This case does not deal with recanted trial testimony. Here, Hayden testified that he gave untrue statements to police regarding how the accident occurred. These statements were unsworn. Later, in a deposition and at trial, he declared that the statements were false and testified under oath that Tubbs was not in the vehicle when the collision occurred. Hayden said that Tubbs induced him to make the false statements and that he did so in order to keep his job.

16

Tubbs has failed to demonstrate that Hayden's testimony was unreliable or contained internal contradictions or inconsistencies with the physical evidence which would cause this court not to afford deference to the jury's factual conclusion and credibility determination. The jury here was able to observe Hayden during his testimony and was aware of his prior criminal background, his prior statements, and the fact that his employment with Tubbs ended under unpleasant circumstances. Regarding the physical evidence, the damage to both vehicles was minor. The police dash camera video taken immediately after the accident shows that the parking lot where the accident occurred was very small and Hayden could not have built up much speed before hitting Tubbs's vehicle. At the scene, Tubbs denied that he was injured. Tubbs had preexisting issues at the same points in his back that he claimed were injured in this accident. He provided different versions of how the accident allegedly occurred to the various medical providers he consulted. The jury considered all the evidence and made a credibility determination and found Hayden's trial testimony to be credible. As outlined above, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. Under the facts presented here, the jury's factual conclusion and credibility determination are entitled to deference.

We also reject Tubbs's argument that the state failed to prove the existence and applicability of an insurance policy and that Tubbs had the intent that the statement signed by Hayden would be used in support of a claim pursuant to an insurance policy. Tubbs argues that the state was required to introduce a copy of an insurance policy or have a witness testify that the statement at issue here was presented to the insurance company.

17

Tubbs contends that the failure to present either of these items of proof warrants a reversal of his conviction. In support of this argument, Tubbs cites three civil cases dealing with the failure to file insurance policies into evidence when the plaintiffs were seeking to recover under those policies.[4] These cases are inapposite to the present case. The record shows that, in his civil lawsuit, Tubbs alleged that State Farm provided uninsured/underinsured motorist coverage and State Farm actually settled the matter with him. The receipt and release were filed into evidence. Tubbs also alleged that USAA had issued one or more policies of insurance on the vehicle driven by Hayden. There is no dispute about the existence of an insurance policy.

Regarding Tubbs's intent concerning the statement signed by Hayden, the statute does not require that the defendant personally submit the statement containing false information directly to the insurance company.

The intent to defraud an insurance company is a specific intent crime. *See State v. Landry*, 2008-1553 (La. App. 1 Cir. 5/8/09), 15 So. 3d 138; *State v. Copes*, 2009-1206 (La. App. 1 Cir. 12/23/09), 2009 WL 5647227. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. *State v. Cousan*, 94-2503 (La. 11/25/96), 684 So. 2d 382; *State v. Landry*, *supra*. Due to the difficulty of

---

[4] *See Cao v. Liberty Mut. Ins. Co.*, 12-954 (La. App. 5 Cir. 5/30/13), 119 So. 3d 725, and *Jackson v. United Servs. Auto. Ass'n Cas. Ins. Co.*, 08-333 (La. App. 5 Cir. 10/28/08), 1 So. 3d 512 (in which no policy of insurance was introduced into evidence to establish coverage); *Ray Brandt Nissan, Inc. v. Gurvich*, 98-634 (La. App. 5 Cir. 1/26/99), 726 So. 2d 474 (in which no supporting documents were introduced into evidence on a rule to show cause for the surrender of a vehicle).

presenting direct evidence as to the defendant's state of mind, the trier of fact may infer intent from the facts and circumstances of a transaction and the defendant's actions. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. *State v. Landry*, *supra*.

Tubbs's bill of information shows that he was charged with violations of La. R.S. 22:1925 and La. R.S. 22:1924(A)(2)(c), in that he did knowingly and intentionally assist, abet, solicit, or conspire with another to prepare or make any written or oral statement intended to be presented to any insurance company, insured, the Department of Insurance, or other party in interest or third-party claimant in connection with, or in support of or denial, or any claim for payment of other benefit pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or fraudulent information concerning any fact or thing material to such claim or insurance policy. This provision does not require that the statement be actually presented to the insurance company by the defendant. The statute requires only that the defendant assist, abet, solicit, or conspire with another to prepare or make any written or oral statement that is *intended to be presented* to any insurance company. The facts show that Tubbs solicited and conspired with Hayden to tell the police that Tubbs was getting into the vehicle when the accident occurred. Tubbs then prepared a statement and solicited and conspired with Hayden to present the statement to the police department claiming that Tubbs was getting into the vehicle when the accident occurred and was knocked to the ground. It also contained the claim that Hayden was backing up at a high rate of speed when the accident occurred, a fact not supported by the physical evidence in the case. The police report and the statement were documents that would be provided to State Farm when

19

Tubbs sought to recover under the policy. The demand letter, dated June 4, 2012, sent on Tubbs's behalf to State Farm, contained a copy of the accident report. From the circumstances, it can be inferred that Tubbs intended that the statement would eventually be presented to the insurance company and would support his claim.

The facts of the present case are somewhat similar to those found in *State v. Landry*, *supra*, where the defendant, the fire chief of Donaldsonville, Louisiana, was found guilty of insurance fraud. Fire departments are required to provide the details of fires to the Property Insurance Association of Louisiana ("PIAL"), a statutorily created rating agency which uses the information in a grading process that affects the rates insurance companies charge residents for fire and homeowner's insurance policies. Fire reports showed that the city did not have enough personnel or equipment responding to fires. After being told that the deficiencies would affect the city's PIAL ratings, the defendant fraudulently altered the records to show that more personnel and equipment responded to fires. The city received a higher protection category rating than it should have. The defendant claimed that the evidence against him was insufficient to prove the elements of insurance fraud because the only entity presented with the false information was PIAL, not any insurance companies. In finding that there was sufficient evidence to convict the defendant, the first circuit found that the statute in effect at that time included knowingly and with intent to defraud preparing with the knowledge and belief that the statement will be presented to an insurer, any written statement which he knows to contain materially false information. Although the wording of the statute in *Landry* is not identical with that here, it is similar and the reasoning of *Landry* is persuasive.

20

Based upon the record before us, the jury did not err in finding that Tubbs committed all the elements of the offense of insurance fraud beyond a reasonable doubt.

## MOTION FOR NEW TRIAL

Tubbs argues that the trial court erred in denying his motion for new trial based upon the discovery of a letter filed into the record after the trial. This argument is without merit.

### Legal Principles

Regarding the grounds for new trial, La. C. Cr. P. art. 851 provides, in relevant part:

> A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
>
> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
>
> . . . .
>
> (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
>
> . . . .
>
> (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

In the context of newly discovered evidence, La. C. Cr. P. art. 854 states:

> A motion for a new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:

21

(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;

(2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;

(3) The facts which the witnesses or evidence will establish; and

(4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.

The newly discovered whereabouts or residence of a witness do not constitute newly discovered evidence.

In order to obtain a new trial based on "newly discovered evidence," the defendant has the burden of showing that (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of the trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict. *State v. Bell*, 2009-0199 (La. 11/30/10), 53 So. 3d 437, *cert. denied*, 564 U.S. 1025, 131 S. Ct. 3035, 180 L. Ed. 2d 856 (2011); *State v. Matthews*, 50,838 (La. App. 2 Cir. 8/10/16), 200 So. 3d 895, *writ denied*, 2016-1678 (La. 6/5/17), 220 So. 3d 752.

A ruling on a motion for new trial rests within the sound discretion of the trial judge. In ruling on the motion, the trial judge's duty is not to weigh the new evidence as though he were a jury determining guilt or innocence; rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury's judgment. *State v. Brisban*, 2000-3437 (La. 2/26/02), 809 So. 2d 923; *State v. Hilliard*, 52,652 (La. App. 2 Cir. 8/14/19), ___ So. 3d ___, 2019 WL 3808037. *See also State v. Matthews*, *supra*.

On review a trial court's discretion will be given great weight; however, where the exercise of discretion is arbitrary and the judgment is

22

unjust, it will be set aside. Furthermore, it is not for the trial judge to weigh the evidence to determine the guilt or innocence of the defendant; rather the judge must ascertain whether another jury presented with all the evidence including that recently discovered, would probably reach a different verdict. *State v. Knapper*, 555 So. 2d 1335 (La. 1990).

Newly discovered evidence affecting only a witness's credibility ordinarily will not support a motion for a new trial, because new evidence which is merely cumulative or impeaching is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial. *Mesarosh v. United States*, 352 U.S. 1, 77 S. Ct. 1, 1 L. Ed. 2d 1 (1956); *State v. Cavalier*, 96-3052 (La. 10/31/97), 701 So. 2d 949. Nevertheless, the court possesses the discretion to grant a new trial when the witness's testimony is essentially uncorroborated and dispositive of the question of guilt or innocence and it appears that, had the impeaching evidence been introduced, it is likely that the jury would have reached a different result. In making this determination, the court may assume that the jury would have known that the witness had lied about the matter. *State v. Cavalier*, *supra*; *State v. Beaner*, 42,532 (La. App. 2 Cir. 12/5/07), 974 So. 2d 667, *writ denied*, 2008-0061 (La. 5/30/08), 983 So. 2d 896. *See and compare State v. Kelly*, 576 So. 2d 111 (La. App. 2 Cir. 1991), *writ denied*, 580 So. 2d 666; *State v. Lyles*, 03-141 (La. App. 5 Cir. 9/16/03), 858 So. 2d 35.

The admissibility at a new trial of the newly discovered evidence is a factor in determining its "fitness" for consideration by a jury at a second trial, and it should be addressed before a conviction is reversed and a new trial ordered. *State v. Coleman*, 2005-1617 (La. 6/29/07), 959 So. 2d 465.

When the allegations of a motion for new trial are not supported by proof, a trial judge properly overrules the motion. Allegations raised in the motion alone are not sufficient, as a defendant has the burden to show that an injustice has been done to him. In the absence of any showing before the trial court that the rights of the accused had been jeopardized, and that the alleged injustice could be rectified at another trial, the court would be warranted in its refusal to set aside the verdict. *State v. McKinnies*, 2013-1412 (La. 10/15/14), 171 So. 3d 861.

**Discussion**

A letter purportedly written by a woman named Jennifer Stovall was mailed to the court detailing a conversation with Hayden in which he said he "would do anything to get even with Mr. Tubbs," because Tubbs fired him from his job.[5] Tubbs was convicted on March 21, 2017. The letter was dated March 31, 2017, and was filed into the court record on April 4, 2017. Copies of the letter and the envelope with Stovall's address on it were attached to the motion for new trial, which was filed on July 7, 2017. The

---

[5] The substance of the letter is as follows:

My name is Jennifer Stovall. I was the foster parent for the juvenile daughter of Anthony Scott Tubbs in 2014 and was called to testify for the state in the aggravated incest case in which he was acquitted in September 2014.

During the time of his trial in September 2014, I became acquainted with another witness in that case, Richard Hayden. Richard Hayden stated to me that Anthony Scott Tubbs had fired him from his job at ASAP [A]ppliances and that he was angry at him for the way he was let go from his job. He stated to me that he would do anything to get even with Mr. Tubbs.

I recently read on the news that Richard Hayden testified against him again in a recent case on insurance fraud in which he was found guilty. I don't know the specifics of that case, however I do know that Richard Hayden has stated to me several times that he was looking for revenge against Mr. Tubbs. I would hate to think that an innocent man would go to jail based on the testimony of someone just out for revenge.

24

motion alleged that defense counsel did not know about the letter until he checked the record. In the motion, Tubbs contended that, if he had known about the letter, he would have called Ms. Stovall to testify at the trial to impeach Hayden's credibility. He contended that the newly discovered evidence warranted the granting of a new trial.

A hearing on the motion was held on October 17, 2017. Ms. Stovall was not called to testify at the hearing nor did Tubbs request that an evidentiary hearing be held. The trial court noted that the appearance of the letter in the record was unusual. The trial court judge, who had been on the bench for 14 years, noted that whenever he receives a letter in a case, he writes on the correspondence "File into the record," signs it, dates it, and sends it to the clerk's office. None of that was done here. The trial court stated, "I'm at a loss to explain as to how it's in the record." Based upon its review of the law and the evidence, the court denied both the motion for new trial and the motion for post verdict judgment of acquittal.

The defendant argues on appeal that the letter constituted new, material evidence bearing on the credibility of Hayden, that it was discovered after the trial, the failure to discover it earlier was not due to a lack of diligence by the defendant, the evidence was material to the issues at trial, and was of such a nature that it would probably produce a different verdict in the event of a retrial. Tubbs contends that, because Hayden's testimony was uncorroborated and dispositive of the question of guilt or innocence, the letter should serve as the basis for the grant of a new trial.

We find no error in the trial court judgment denying the motion for new trial. Essentially, Tubbs presented no evidence in support of his motion. The Stovall letter was filed into the record under highly irregular

circumstances and a copy of the letter was merely attached to the motion for new trial. Tubbs did not call Ms. Stovall to testify at the hearing and did not attempt to introduce the letter into evidence.

Even if Tubbs had attempted to introduce the unsworn letter into evidence, it likely would have been found to be inadmissible hearsay under La. C.E. art. 801(C), which defines hearsay as a statement other than one made by the declarant while testifying at the present trial or hearing, offered into evidence to prove the truth of the matter asserted. Hearsay is inadmissible except as provided by law. La. C.E. art. 802. Had Ms. Stovall been present to testify, it is not clear that Tubbs could have established that the statement fell within one of the exceptions to the hearsay rule.

As stated above, newly discovered evidence affecting only a witness's credibility ordinarily will not support a motion for new trial. In support of the motion for new trial, Tubbs presented only bare allegations of possible bias on the part of Hayden. The allegations were unsupported by competent evidence fit for consideration by a new jury. The jury in this matter was informed that Hayden left his employment with Tubbs under less than favorable circumstances and was able to use that information in its assessment of Hayden's credibility and possible motives for testifying differently from his prior statements. Tubbs failed to offer any new evidence not previously presented to the jury. Accordingly, due to the lack of any competent evidence to support the motion for new trial, the trial court did not err in denying the motion in this matter.

### EXCESSIVE SENTENCE

Tubbs argues that his sentence of imprisonment for a first nonviolent felony offense is excessive. This argument is without merit.

26

**Legal Principles**

An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. Hilliard*, *supra*; *State v. DeBerry*, 50,501 (La. App. 2 Cir. 4/13/16), 194 So. 3d 657, *writ denied*, 16-0959 (La. 5/1/17), 219 So. 3d 332. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. DeBerry*, *supra*. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. *State v. Smith*, *supra*; *State v. Kelly*, 52,731 (La. App. 2 Cir. 6/26/19), 277 So. 3d 855. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. *State v. Jones*, 398 So. 2d 1049 (La. 1981); *State v. DeBerry*, *supra*. There is no requirement that specific matters be given any particular weight at sentencing. *State v. DeBerry*, *supra*; *State v. Shumaker*, 41,547 (La. App. 2 Cir. 12/13/06), 945 So. 2d 277, *writ denied*, 07-0144 (La. 9/28/07), 964 So. 2d 351.

Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. Art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more

27

than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. Meadows*, 51,843 (La. App. 2 Cir. 1/10/18), 246 So. 3d 639, *writ denied*, 18-0259 (La. 10/29/18), 254 So. 3d 1208.

The sentencing court has wide discretion in imposing a sentence within statutory limits, and such a sentence will not be set aside as excessive in the absence of manifest abuse of that discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Duncan*, 47,697 (La. App. 2 Cir. 1/16/13), 109 So. 3d 921, *writ denied*, 13-0324 (La. 9/13/13), 120 So. 3d 280. The trial court is in the best position to consider the aggravating and mitigating circumstances of a particular case and, therefore, is given broad discretion in sentencing. *State v. Cook*, 95-2784 (La. 5/31/96), 674 So. 2d 957, *cert. denied*, 519 U.S. 1043, 117 S. Ct. 615, 136 L. Ed. 2d 539 (1996); *State v. Jackson*, 51,575 (La. App. 2 Cir. 9/27/17), 244 So. 3d 764; *State v. Hilliard*, *supra*. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Kelly*, *supra*.

When an individual receives a full executive pardon by the governor upon recommendation of the Department of Corrections, he is restored to the status of innocence. La. Const. Art. IV, § 5(E)(1). *See State v. Childers*, 197 La. 715, 2 So. 2d 189 (1941); *State v. Lee*, 171 La. 744, 132 So. 219 (1931); *State v. Riser*, 30,201 (La. App. 2 Cir. 12/12/97), 704 So. 2d 946. In *State v. Adams*, 355 So. 2d 917 (La. 1978), the court held that a full pardon

by the governor would preclude the use of a pardoned offense to enhance punishment, while the automatic first offender pardon established by La. Const. Art. IV, § 5(E)(1) would not. *See State v. Riser*, *supra*; *State v. Rollins*, 32,686 (La. App. 2 Cir. 12/22/99), 749 So. 2d 890, *writ denied*, 2000-0549 (La. 9/15/00), 768 So. 2d 1278.

Prior criminal activity is one of the factors listed in La. C. Cr. P. 894.1 to be considered by the trial judge in selecting a sentence. Prior criminal activity is not limited to convictions. *State v. Brown*, 410 So. 2d 1043 (La. 1982); *State v. Washington*, 414 So. 2d 313 (La. 1982); *State v. Palmer*, 448 So. 2d 765 (La. App. 2 Cir. 1984), *writ denied*, 452 So. 2d 695 (La. 1984).

### Discussion

Tubbs argues that he should not have been sentenced to serve any time in prison. He maintains that, because he is a first felony nonviolent offender, he should have only received probation in this matter. Tubbs asserts that, in imposing sentence, the trial court improperly considered a prior offense of insurance fraud for which he received a full gubernatorial pardon, restoring him to innocence.

In imposing sentence, the trial court fully complied with the sentencing guidelines of La. C. Cr. P. art. 894.1. The court noted that it considered a presentence investigation prepared in this matter, as well as a letter from Tubbs expressing appreciation for the professional and respectful way he was treated during the case.

As a mitigating factor, the court considered Tubbs to be relatively young at 47 years old. The court considered the present conviction to be a first felony offense. Tubbs had some charges for issuing worthless checks, which were dismissed, and received a governor's pardon for a 1999

29

insurance fraud conviction involving the arson of a vehicle. The court stated that offense could not be utilized for sentence enhancement, but could "be reviewed for the nature of that offense." The court specified that it did not consider other charges for which Tubbs was acquitted.

The trial court noted Tubbs's social history that he was married with two children. The court considered Tubbs's work history and his National Guard service.

Based upon these factors, the trial court sentenced Tubbs to five years at hard labor, with all but one year suspended, with credit for time served. Tubbs was placed on four years' supervised probation, ordered to pay probation fees and a fine of $1,500. He was also ordered to pay restitution to State Farm in the amount of $8,500, to be paid over the first three years of probation. Tubbs was correctly informed of the delays for filing an appeal and an application for post conviction relief.[6]

The sentence imposed was not constitutionally excessive. Tubbs coerced an employee to make a false statement concerning how this very minor accident occurred. Based upon that false statement, Tubbs claimed serious physical injury in order to profit financially. The period of incarceration imposed was low and was not excessive under the facts of this case. Also, the trial court did not err in noting Tubbs's gubernatorial pardon for insurance fraud. While a governor's pardon restored Tubbs to a position of innocence, the trial court was entitled to review all prior criminal activity, including arrests that did not result in convictions. We do not find, under the facts presented here, that the pardoned offense inappropriately influenced

---

[6] Tubbs announced in court his intent to appeal and the trial court granted him an appeal bond of $25,000.

the trial court's sentencing determination. Our sense of justice is not shocked by the sentence imposed.

## CONCLUSION

For the reasons stated above, the defendant's conviction and sentence are affirmed.

**AFFIRMED.**