# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-403

**STATE OF LOUISIANA**

**VERSUS**

**DANIEL E. JOHNSON**

\*\*\*\*\*\*\*\*\*\*

ON APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 17-K-2691-D
HONORABLE D. JASON MECHE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JONATHAN W. PERRY
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Jonathan W. Perry and Sharon Darville Wilson, Judges.

**AFFIRMED.**

Mary Constance Hanes
Louisiana Appellate Project
P. O. Box 4015
New Orleans, Louisiana 70178-4015
(504) 866-6652
ATTORNEY FOR DEFENDANT/APPELLANT:
    Daniel E. Johnson


Honorable Chad Pitre
District Attorney
Parish of St. Landry
Kathleen E. Ryan
Assistant District Attorney
Post Office Drawer 1968
Opelousas, Louisiana 70571
(337) 948-0551
ATTORNEY FOR APPELLEE:
    State of Louisiana

**PERRY, Judge.**

In this criminal case, Daniel E. Johnson ("Defendant") appeals his conviction of second degree murder, a violation of La.R.S. 14:30.1. We affirm.

## FACTS AND PROCEDURAL HISTORY

On June 3, 2017, at approximately 1:00 a.m., Defendant shot and killed his wife, Lashanna Ward-Johnson ("the victim"), in their home. Defendant contends he mistook his wife for an intruder.

On August 29, 2017, Defendant was charged by grand jury indictment with one count of second degree murder. After a four-day jury trial, a unanimous jury convicted Defendant on April 16, 2021, of second degree murder. Subsequently, on April 22, 2021, the trial court sentenced Defendant to a mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant filed a motion for appeal on April 22, 2021, which was granted that same date. Defendant has alleged one assignment of error, arguing that the evidence was insufficient to support his conviction. Because Defendant challenges the sufficiency of the evidence, we have chosen to detail the facts surrounding the victim's death in the body of this opinion.

## ERRORS PATENT REVIEW

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record. After carefully reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR

Defendant claims the evidence was insufficient to convict him of his wife's murder because the State failed to prove he specifically intended to kill her. Rather, Defendant contends the evidence showed that he shot his wife by mistake, believing she was an intruder.

In *State v. Hawthorne*, 53,932, pp. 13-14 (La.App. 2 Cir. 9/22/21), 327 So.3d 606, 613-15, *writ denied*, 21-1710 (La. 1/12/22),___ So.3d ___, the court stated the following regarding the review of a record for sufficiency of the evidence:

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So.2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L.Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So.2d 517; *State v. Dotie*, 43,819 (La.App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So.3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So.2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L.Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442; *State v. Green*, 49,741 (La.App. 2 Cir. 4/15/15), 164 So.3d 331. A reviewing court affords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La.App. 2 Cir. 5/20/20), 296 So.3d 1156; *State v. Broadway*, 53,105 (La. App. 2 Cir. 1/15/20), 288 So.3d 903, *writ denied*, 20-372 (La. 7/24/20), 299 So.3d 78.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Green*, *supra*; *State v. Glover*, 47,311 (La.App. 2 Cir. 10/10/12), 106 So.3d 129, *writ denied*, 12-2667 (La. 5/24/13), 116 So.3d 659. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 50,643 (La.App. 2 Cir. 6/22/16), 197 So.3d 717, *writ denied*, 16-1479 (La. 5/19/17), 221 So.3d 78; *State v. Gullette*, 43,032 (La.App. 2 Cir. 2/13/08), 975 So.2d 753. Such testimony alone is sufficient even where the State does not introduce medical, scientific, or physical evidence. *State v. Larkins*, 51,540 (La.App. 2 Cir. 9/27/17), 243 So.3d 1220, *writ denied*, 17-1900 (La. 9/28/18), 253 So.3d 154. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on the fact finder's discretion

only to the extent necessary to guarantee the fundamental due process of law. *State v. Casey*, *supra*.

Against that backdrop, we will now review the evidence the State presented to the jury during this four-day trial.

The first witness to testify was Dr. Christopher Tape ("Dr. Tape"), a medical doctor with a specialty in forensic pathology who was accepted as an expert in that field. Dr. Tape identified five gunshot wounds on the victim's body but agreed with the State that he could not determine the sequence of the victim's wounds. While performing the autopsy of the victim, Dr. Tape observed the following gunshot wounds: (1) entering just below the chin and lodging on the back of the neck; (2) entering at the sternal notch, traveling slightly upward; (3) entering above the collarbone at the right side of the body, exiting at the upper, right back; (4) entering on the back, right shoulder, traveling across the body, exiting, and immediately reentering the body, to finally lodge in the back of the victim's neck; and (5) entering the palm of the hand and possibly traveling into the victim's body

According to Dr. Tape, the victim died as a complication of blood loss and breathing blood. After conducting his postmortem examination, Dr. Tape opined that the victim's cause of death was "gunshot wounds to the neck and body" and further that the victim's manner of death was a homicide.

Tina McNaulty ("Tina"), an acquaintance of the victim, testified that she was with the victim from around 6:00 p.m. to 11:00 p.m. on June 2, 2017. They first attended a kindergarten graduation ceremony for Italy, the victim's oldest child, and then went to eat at Buffalo Wild Wings. According to Tina, the victim and her three children were with them at Buffalo Wild Wings. The last time Tina saw the victim was when she dropped the victim and her children off at the victim's car around 11:00 p.m. Tina then viewed a surveillance video from Buffalo Wild Wings dated

June 2, 2017, and identified their group leaving Buffalo Wild Wings at 11:19 p.m. Tina next testified that around 12:50 a.m., she received the following text message from the victim, "I had to break my door to get n [sic] my house smh guh [sic] I'm hot." The victim's sister, Angela McNaulty ("Angela"), would later explain this textual shorthand as "shaking my head, girl I'm hot".

On cross-examination, Tina testified that Defendant also attended the graduation, but she believed that he and the victim traveled separately. When the graduation ceremony was over, Tina saw the victim and Defendant talking in the foyer. Tina testified that Defendant did not accompany them to Buffalo Wild Wings and stated that she knew Defendant had undergone back surgery the week before. According to Tina, the victim did not have a phone with her that night because she left it at home. When asked if, to the best of her knowledge, the victim had a key to her house, Tina responded, "No, she did not have a key there." Finally, when asked how long after the victim retrieved her car did she receive the text from the victim, Tina testified that they talked at her grandmother's house for fifteen to twenty minutes, she drove home, and then received the text later.

Angela testified to the same events as Tina. Angela also explained that the victim sent her a text message, the same one sent to Tina, after the victim broke into her house: Angela further testified that the victim and Defendant did not sit together at the graduation.

Estelle Boutte ("Ms. Boutte"), the victim's mother, testified that the victim was twenty-four years of age when she died and had three children, Paris, Roman, and Italy. Ms. Boutte remembered seeing her son-in-law, the Defendant, standing against the wall at the kindergarten graduation ceremony. Ms. Boutte also talked to the victim as she was leaving the ceremony and saw her again later that night.

4

Unsure of the exact time, Ms. Boutte testified that the victim and her three children went to Ms. Boutte's house later that night. Two of the children stayed with Ms. Boutte, but the victim wanted to take Paris, her eight-month old daughter, home with her. According to Ms. Boutte, the victim had left her phone at home, so she used Ms. Boutte's phone to call her residence. When asked if the victim was able to contact anyone at her home, Ms. Boutte responded, "Uh, no, not that I know of."

When the State asked Ms. Boutte if there was any discussion between her and the victim regarding a key to the house, the following colloquy ensued:

A.     Uhm, earlier that day but not at that time.

Q.     Earlier that day had she indicated that she did or did not have a key?

A.     She had her key but when she looked on her keyring it was gone.

Q.     So, was she surprised that it was missing when she---?

A.     Yes.

The State then asked Ms. Boutte if she received any text messages after the victim left her home. Ms. Boutte testified that Defendant was listed in her phone contacts as "DJ[.]" Frank Garcia, a technical support officer for the State Police, had previously testified that he retrieved forty-two text messages sent between Defendant's cell phone and Ms. Boutte's cell phone between 11:45 p.m. and 12:18 a.m. on the night in question. When shown a series of text messages, Ms. Boutte identified pages 9116 to 9127 as text messages she received from Defendant. Ms. Boutte described the text messages as a conversation she and Defendant were having about the night.

The text messages were introduced and were published to the jury. The text messages began by Defendant texting Ms. Boutte to tell her that the victim left her phone at home in case Ms. Boutte was wondering why the victim was not answering.

5

Ms. Boutte responded that she had talked to her.  The following messages then ensued between the two:

June 2, 2017

- Ms. Boutte to Defendant 11:48:58 p.m. – "Jesus answer me when I ask."
- Defendant to Ms. Boutte 11:49:37 p.m. – "What Jesus did"
- Defendant to Ms. Boutte 11:53:24 p.m. – "???"
- Defendant to Ms. Boutte 11:54:08 p.m. – "IG gnite"
- Ms. Boutte to Defendant 11:54:11 p.m. – "I take [sic] to her without a phone lol can Jesus do it for you. lol"
- Ms. Boutte to Defendant 11:54:19 p.m. – "Good night"
- Defendant to Ms. Boutte 11:54:57 p.m. – "DNT won't him 2"
- Defendant to Ms. Boutte 11:55:44 p.m. – "He needed kp her tanite"
- Ms. Boutte to Defendant 11:55:46 p.m. – "lol"
- Defendant to Ms. Boutte 11:57:03 p.m. – "And n da am"
- Ms. Boutte to Defendant 11:57:42 p.m. – "she on her way home."
- Defendant to Ms. Boutte 11:57:53 p.m. – "He answered my prayers he letting me suffer n peace"
- Ms. Boutte to Defendant 11:58:57 p.m. – "I guess if that how u feel about your family who has been there for u.  God knows"
- Defendant to Ms. Boutte 11:59:48 p.m. – "God knows she bn making my pain worst da last few days"

June 3, 2017

- Defendant to Ms. Boutte 12:00:06 a.m. – "Needa brk"
- Defendant to Ms. Boutte 12:01:15 a.m. – "On a scale 1 ta 10 15"
- Defendant to Ms. Boutte 12:01:25 a.m. – "R 20"
- Ms. Boutte to Defendant 12:01:27 a.m. – "Maybe GOD will help you because I see she not good enough for you.  Still no thanks for her.  God see."
- Defendant to Ms. Boutte 12:02:10 a.m. – "She got u u always helping her so dats not true gnite"
- Ms. Boutte to Defendant 12:04:25 a.m. – "What every I keep your kids so she could be there for u but that not good so I see just u count.  God will have to show u some more thing I'll pray for u."
- Defendant to Ms. Boutte 12:10:01 a.m. – "I'm b hm be faithful so it's gudd"
- Defendant to Ms. Boutte 12:11:40 a.m. – "N when wanted u still took Dem so wats da prob???? Dey love u"
- Defendant to Ms. Boutte 12:11:52 a.m. – "Wanted dem"
- Ms. Boutte to Defendant 12:13:21 a.m. – "it never a problem but I thought u would see we care about you but I guess that don't matter but I'm good. night"
- Defendant to Ms. Boutte 12:17:40 a.m. – "She left me stuck 3 times since bn out I fell on floor"

6

- Defendant to Ms. Boutte 12:18:07 a.m. – "No hard feelings I still love her"
- Defendant to Ms. Boutte 12:18:12 a.m. – "Gnite"

When asked if she went to the victim's residence later on June 3, Ms. Boutte responded, "Yes, somebody just called and said I needed to go to my daughter's house." Ms. Boutte did not know what time she arrived at the residence. According to Ms. Boutte, an officer at the scene was surprised when she mentioned a child being in the house. Ms. Boutte testified that someone finally brought the child to her "hours" later. When asked what she observed upon seeing the child, Ms. Boutte answered, "Uhm, she was in her---a blanket that her mama would---after she would clean her up she would put her in her bed and would swaddle her." The following colloquy ensued:

Q. Did it appear to you that [the baby] had been bathed?

A. Yes.

Q. So, from the time you saw her until you saw---last saw your daughter and her child until the time the child was brought out to you by the officer, she had been obviously bathed and changed and, as you said, swaddled?

A. Swaddled.

Q. Alright, is that correct?

A. Yes.

Q. Are you positive about that Ms. Boutte?

A. A hundred percent positive.

Q. What's that?

A. Yes.

Q. Did that surprise you?

A. No.

7

On cross-examination, Ms. Boutte testified that Defendant had been having back trouble for a long time and had just had surgery. When asked if Defendant was sitting with the victim at the graduation or just standing, Ms. Boutte responded, "Just standing up walking around."

Officer Nelson Simmons ("Officer Simmons"), an Opelousas Police Officer, testified that he was the first officer on the scene. When Officer Simmons reached the doorway to the residence, he saw a female lying on the floor and a male standing inside the residence. Officer Simmons asked the male if he had a gun, and the male produced a weapon from his robe pocket. The male obeyed Officer Simmons's instruction to drop the weapon on the ground. Officer Simmons then called the male outside and placed him in a police car.

Sergeant Brandon Harris ("Sergeant Harris"), an investigator with the Opelousas City Police, testified that he was the officer in charge of collecting evidence at the crime scene. According to Sergeant Harris, a firearm was found on the floor, just to the left side of the victim's body. Sergeant Harris also found several spent casings—one on the living room floor behind the door; one on the living room floor underneath a chair behind the front door; one on the living room floor behind the door near the chair; one on the couch in the living room; one inside of a gray bucket near the living room sofa; one on the living room floor in the northwest corner; and one located in the dining room area underneath the table. Sergeant Harris then identified several pictures that were taken of the scene on the night of the shooting. Sergeant Harris also identified other photographs that were taken after he viewed video surveillance from Buffalo Wild Wings:

> A.     I had the opportunity to view the video surveillance at Buffalo Wild Wings, and in the course of viewing the video I observed Ms. Johnson walking---exiting the restaurant with a ToGo box in hand. And I couldn't recall if I had taken pictures or even seen the box while I was

8

at the residence on the night of the homicide, so I obtained a search warrant to re-enter the residence to look for this box along with a cell phone.

Q.    And so, you found it---those boxes?  It's kind of hard to see, but are they ToGo boxes from Buffalo Wild Wings?

A.    Yes, it is.

As Sergeant Harris was processing the scene on the night in question, he took a picture later identified at trial as a "picture of the bathtub with a small amount of water along with a washcloth inside the bathtub."  On a subsequent occasion, Sergeant Harris returned to the general area of the homicide and spoke with a person named "Ned;" this person would later be identified as Christopher Ned ("Mr. Ned"), the resident of the neighboring trailer.  Sergeant Harris located an apparent bullet hole in an exterior wall of Mr. Ned's trailer.  While inside the trailer, Sergeant Harris found a projectile inside a VHS tape located on the living room floor.  Finally, Sergeant Harris testified that he attended the victim's autopsy and received into evidence two projectiles and projectile fragments.

On cross-examination, Sergeant Harris estimated that he arrived at Defendant's residence less than an hour after the initial 911 call.  At that time, Defendant was leaning against the ambulance.  Sergeant Harris agreed with defense counsel that from an investigative standpoint, there had been a forced entry into the residence, and the door had been broken as a result.  The following colloquy ensued regarding a black chair that had been apparently propped up against the door:

Q.    And did---when you were also inside, did it appear that at some point in time, before the door was pushed open that there was a chair propped up against the back of it?

A.    That's what it appeared.

Q.    A black chair?

A.    A black chair.

9

Q.      So, it would appear that one, there was a force---some force was used to get the door opened and that there may have been an additional attempt for security, a chair behind it?

A.      That's correct.

On re-direct examination, Sergeant Harris identified a black cell phone that he found on the living room floor near the sofa; it would later be determined that this was Defendant's phone.  Although Sergeant Harris looked for another phone at the residence, no such phone was found.

Major Mark Guidry ("Major Guidry") with the Opelousas Police Department testified that the police department received the first 911 call from Defendant's residence at 1:11 a.m. on June 3.  When asked if another call was received, Major Guidry testified that there were notes in the computer-aided dispatch report that a second call was received.  Additionally, Major Guidry testified that the first officers arrived at approximately 1:13 a.m.  On cross-examination, Major Guidry testified that Sergeant Harris, the detective handling the matter, arrived twenty minutes later at 1:36 a.m.

Defendant's next-door neighbor, Mr. Ned, testified that he lived approximately fifteen feet from Defendant in the same trailer park.  When asked if he heard any sounds from Defendant's residence on the night/morning in question, Mr. Ned testified that he heard sounds throughout the night and into the following morning.  Later, Mr. Ned stated that he kept hearing someone repeatedly knocking from "ten and fifteen minutes, twenty minutes."  Mr. Ned testified further:

A.      First I heard her [the victim] out of my sleep and then when I got up to see what was "goin" on---mind you, my windows that I was "peepin" out of was full of mud from car tires "spinnin" on that side of the house---I could vaguely see who it was but I knew who it was by her voice and the words she was "sayin."

Q.      Could you hear what she was saying?

A.    Yes, sir.

Q.    What did she say?

A.    Let me in my house. I "wanna" "git" in my house. And repeatedly---repeatedly "knockin".

Q.    Was there any response that you heard?

A.    No response.

Q.    Did you ever hear any sound that they---that the door being pushed, I mean, bodily pushed opened?

A.    No. What I did see was she got off her step and she walked towards the street and she went around her house. So, I went back to bed.

When asked if he later heard noises that sounded like fireworks, Mr. Ned replied, "Out of my sleep, I did." Mr. Ned estimated that he heard the "fireworks" five to ten minutes, maybe less, after he observed the victim trying to get into the residence. Mr. Ned explained that he was not watching the clock, as he was in and out of sleep. Although Mr. Ned did not get up when he heard "fireworks," he did get up when he heard something fall in his living room. When asked when he knew what it was, Mr. Ned responded:

A.    Well, when I got up, turned my kitchen light on, I saw his [Defendant's] vehicle had backed up from where it was originally parked and he was "drivin" off on the side of her car and in-between my trailer. Then I went to see what the noise was. It sound like a mouse trap went off and I know I didn't have a mouse trap set. It was some video cassettes that I had stacked up for years had fallen over. So, I didn't pay it any mind I just picked up the debris and put it in the garbage and went back to bed.

Mr. Ned testified that at that point he could not tell who was driving the vehicle. When asked if the vehicle had difficulty getting out of the driveway, Mr. Ned replied:

A.    Well, when I got up it wasn't parked where it originally was. His vehicle and her vehicle were bumper to bumper for when I saw her "knockin" and when I got up it was backed up about from me to you

11

and the vehicle drove around her car to get out from "outta" the "parkin" area where it was.

Q.     Was that vehicle able to leave or did it have difficulty leaving?

A.     It had a little difficulty leaving but it was no real bog down.  You know, it was just "spinnin" tires.

Q.     Spinning tires?

A.     It was real muddy.

Q.     Okay, real muddy in the yard?

A.     Yes, sir.

Q.     And did you continue watching where the car went?  Did you see the direction of the vehicle?  What was it, a car or a truck?

A.     Uh, it was like a Blazer SUV, white.

Q.     Alright, and did you see it return?

A.     I think it took a right turn going south.

Q.     Okay.  Did you see the vehicle return?

A.     I saw when the vehicle "return" approximately five to seven minutes later.  No longer than that.

Q.     And at that point were you able to determine who was operating the vehicle?

A.     Yes.

Q.     And who was that person?

A.     Mr. Johnson.

Mr. Ned identified Defendant as Mr. Johnson.

When asked if he went to bed or if something else happened, Mr. Ned responded:

A.     Well, when he came---drove around the backside of the house he didn't park his vehicle directly like it was before, vertical, he parked it diagonal his frontend facing his steps and his rear-end hatchback facing mine, and he had his flashers on.

12

Q. Okay.

A. Then he got out of his vehicle, went to the front door and he had difficulty opening the door, so he had to use a little shoulder bump a couple of times for the door to open. I didn't pay it no mind. I figured maybe the man's door was jammed, and in hindsight, I pretty much know why that door was blocked.

Mr. Ned went back to bed, but around 1:25 a.m. or 1:30 a.m., he saw flashing lights reflected in his bedroom window and learned that it was the Opelousas Police Department. According to Mr. Ned, the sound of his videotapes falling occurred between the time the victim was banging on the door and the time the SUV driven by Defendant left.

On cross-examination, Mr. Ned testified that on the night in question, he went to bed around 9:00 p.m. but was not able to sleep since he was "up and down" and hearing noises. Mr. Ned estimated that he first heard noises about thirty minutes after he laid down but emphasized that he was not "watching the clock." The first group of sounds, Mr. Ned testified, were sounds that he had heard repeatedly since he moved in. Mr. Ned believed those sounds were from Defendant walking with a cane. When the State asked him when he first heard sounds that may have been from outside, Mr. Ned replied:

A. Well, I would constantly hear car doors slam. When they would drive up, you know, slam the doors "git" whatever they need "outta" their house, "outta" their car, house door "slammin" when they were in and out whatever places they had to go or come from.

Q. So---

A. I could hear that click.

Q. So, during that evening you heard---hard to say on how many occasions---maybe a car drive up to the trailer, you heard the door slam and then you heard the car leave again?

A. Well, most of the noise I heard was the "stompin" and "thumpin" of the cane or walker or whatever. I wasn't aware when his wife drove up other than "knockin" on the door.

13

Q.    Alright, so that's the time that---so the earlier sounds that you heard were of someone apparently walking around in the house?

A.    That's what kept me up.

Q.    Then the second group of sounds that you heard---and that continued.  The second group of sounds that you heard was his wife driving up to the house?

A.    I didn't hear her drive up but I heard her continuously "knockin".

Q.    Knocking.

A.    I don't know when she drove up.  I just know when I heard her "knockin" from the outside.

Q.    Alright, she was knocking from the outside and she was saying what again, let me in my house?

A.    Let me in my house.  I "wanta" "git" in my house.

Q.    Was she knocking on the door and knocking---what was she knocking on?

A.    I heard it, I didn't see it.  When I got up that's when I saw her "gittin" off her steps "goin" around.  I heard the "knockin".  I can't tell you if she was "hittin" on the wall or window.

Q.    Right.

A.    Well, not really window but the "knockin", it was a glass door on the outside of it.

Mr. Ned estimated that the victim knocked "between ten, fifteen, maybe twenty minutes" but explained that he was not watching the clock.  Mr. Ned also stated that the only voice he heard was the victim's.  When asked if he heard anything coming from the inside of the house in response to the victim, Mr. Ned testified, "It was just as silent as it was in my house . . . ."  Mr. Ned went back to bed when he saw the victim walk around toward the back of her house, where there was a back door.  Mr. Ned testified that he never saw the victim again.

Mr. Ned testified that the next time he got up was when he heard something fall in his house.  When asked if he heard firecrackers, Mr. Ned answered, "I heard

14

'somethin' in the middle of my sleep." The firecracker sound, Mr. Ned explained, was from outside his residence. The sound inside of his house, however, sounded like a rat trap going off, which he later learned was video cassettes falling over. As for how much time passed between Mr. Ned seeing the victim walk toward the back of her house and Mr. Ned hearing the firecracker sound, Mr. Ned testified:

> A.　Give or take five---between five and ten minutes, or maybe less. Like I said, I went back to bed "dosin" off again for about the fourth or fifth time. I don't know how many times I got up, go back to bed, try to sleep.

According to Mr. Ned, he did not hear anything that sounded like a door being broken. When asked if he heard any verbal arguments between the victim and Defendant at any time that evening, Mr. Ned responded:

> A.　I was - - -when I got back home from Lake Charles, I "git" in, take a shower, unwind, relax---I don't even think they were home. I don't think so.

> Q.　Right. What time did you get back from Lake Charles?

> A.　Uh, between 6:00 or so.

According to Mr. Ned, he first became aware of police in Defendant's backyard around "1:30 or [a] minute or so passed."

The next witness, Madayzjnay Texada ("Ms. Texada"), knew Defendant and was near Defendant's residence around 4:00 p.m. on the afternoon of June 2, 2017. Ms. Texada described her interaction with Defendant as follows:

> A.　Uhm, well, whenever I had seen him at first he was "kinda" angry or whatever, and I had passed by him and, like, chill out and he was, like, boy shut up.

> Q.　Wait, wait. I'll have to take it in pieces. You said chill out?

> A.　Yes, sir.

> Q.　You said chill out to him?

> A.　No, he told me---yes, sir, I told him to chill out, yes, sir.

15

Q.     And then he said---what did he respond?

A.     He was, like, aw boy shut up.

Q.     You're not a boy?

A.     No, sir.

Q.     And did you say something to that?

A.     Uh, I was, like, I'm not a boy, and he was, like, oh my bad girl, oh shut up, yes, sir.

Q.     Was he angry at that point?

A.     Yes, sir.

Q.     Alright.  What else did he say after he said that?

A.     Well, uhm, you want me to…?

Q.     Listen, everybody's adults here.  There is a child, but we're going to have to make do.

A.     Well, uhm, from my understanding they were going back and forth.  He was "kinda" angry.

Q.     Who is they?

A.     Mr. Johnson and Ms. Johnson.

Q.     Was she there at the place at the time?

A.     No, sir, no that that [sic] time.

Q.     Okay.  But he was angry about something between the two of them?

A.     The two of them, yes, sir.

Q.     Okay.  Did he have words about her?

A.     Uhm, well, uhm, when I questioned him about what was wrong he was just, like, I'm tired of this---I don't want to curse, you know.

Q.     No, no, we---you have to.

A.     Yes, sir.  He was, like, well I'm tired of this bitch.  I'm about to kill this bitch.  Excuse my language, Your Honor.

16

Q. And he said that?

A. Yes, sir.

Q. And what was your response to him saying I'm "gonna" kill her?

A. I'm, like, oh boy chill out "wit" all that, you know, streetwise, and we just carried on "wit" the day.

When asked if Defendant indicated how he intended to kill his wife, Ms. Texada responded:

A. Well, at first he was, like, he was "gonna" pick up a stick and hit her across the head "wit" it. And then he was just, like, naw I'm a just shoot the bitch, and I'm, like, no, like, you "trippin", like, chill out "wit" all that, and he was, like, naw I'm just tired of it. I'm tired of that. Like, he was "sayin" it but I really wasn't "payin" him no mind because I grew up "wit" him I wasn't "expecin" him to, you know, actually do "anytin" like that, but that's why I wasn't "payin" him too much attention but I was, like, you know, like, chill out, you know, like, y'all "gonna" be good. He was, like, naw I'm done. I'm tired of that. I'm tired of that, or whatever.

Later, Ms. Texada saw Defendant standing in the back of the church for the kindergarten graduation and also saw Defendant in the fellowship hall after the graduation. According to Ms. Texada, she saw Defendant for "not even really five minutes 'cuz' he came in and he left out." Ms. Texada also stated that she did not see any contact between Defendant and the victim at the kindergarten graduation.

On cross-examination, Ms. Texada testified that the conversation she had with Defendant took place in front of Defendant's home. Ms. Texada saw the victim drive away with all three of the children between 4:00 p.m. and 5:00 p.m. and did not see her come back. When asked if she saw any squabbling between the victim and Defendant, Ms. Texada replied:

A. I "seen" "em" argue---well, I can't say I physically "seen" "em" "arguin" but the reactions that they were "arguin" because she pulled out very fast and he pulled out behind her but he pulled back up home, and then he pulled up home that's when I took off "walkin" down the street.

17

Q. Okay, when you say he pulled up, he pulled his car deeper into the yard or something?

A. In the driveway, yes, sir.

Q. In the driveway?

A. Yes, sir.

Q. So, after his wife left he moved his vehicle?

A. Yes, sir.

Job Moten ("Mr. Moten"), a person who had known Defendant all his life, testified that he saw Defendant two days before the incident. At that time, Mr. Moten and Defendant were both at the house of Willie King ("Mr. King"), a friend who lived near Defendant. When asked if Defendant talked about anything, Mr. Moten responded:

A. Uh, when I came up he was "sayin" "I'ma" kill that bitch. "I'ma" kill that bitch. And he was "talkin" about how they was "havin" a shootout, you know, "shootin" at each other, and she went back to look for her gun a couple of days later and he had done already took it.

Q. Alright, and so he said he had taken it. Did he say he---how she got the gun?

A. Ah, he hadn't said it.

Q. I'm sorry?

A. I didn't hear that part.

Q. Okay. So, did he indicate who had purchased it though?

A. He did.

Q. He said he had purchased the gun?

A. Yes, sir.

Q. And so, was it for her or for him?

A. He bought it for her.

Q He bought it for her?

18

A.     Yes, sir.

Q.     And he said he had taken it---he had gone back and taken it?

A.     Right.

According to Mr. Moten, Defendant also threatened Ms. Boutte, the victim's mom.  Mr. Moten testified that Defendant "said he was 'gonna' kill her mom also because she always in 'they' business."  In Mr. Moten's opinion, Defendant did not appear to be angry when he made these statements.  When asked if Defendant's statements surprised him, Mr. Moten stated:

A.     Uhm, well, I mean, I kind of heard, you know, other married people, you know, say things like that but I didn't really pay it no attention.  I didn't think he was, you know---it was "gonna" be like that, you know.

On cross-examination, Mr. Moten explained that he overheard a conversation that Defendant and Mr. King were having.  Mr. Moten also stated that the conversation took place around 4:00 p.m. two days before the incident.  The content of that conversation was not revealed during Mr. Moten's testimony.

As its final witness, the State recalled Sergeant Harris.  Sergeant Harris testified that he was the officer who secured the surveillance video from Buffalo Wild Wings.  On cross-examination, defense counsel asked Sergeant Harris if he learned that calls were made to 911 regarding the incident.  Sergeant Harris agreed there were calls made but did not recall if they were made to 911 or made to the dispatcher.  According to Sergeant Harris, Defendant made the calls, and the nature of the calls was a domestic disturbance.  Finally, on cross-examination, Sergeant Harris testified that a pair of slippers and the victim's purse were found in the victim's car.  The State responded on re-direct by asking Sergeant Harris if he remembered hearing testimony about the yard being muddy. When Sergeant Harris agreed that he had heard such testimony, the State showed him two photographs that

Sergeant Harris identified as pictures of the bottom of the victim's feet. " The State asked Sergeant Harris if he noticed any mud on the photograph of the victim's feet. Sergeant Harris responded, "No, I didn't."

After the State rested its case, defense counsel called Defendant to the stand. Before Defendant testified, the trial court questioned him out of the jury's presence and determined that he was knowingly, voluntarily, and intelligently deciding to testify. Back in the jury's presence, Defendant testified that at the time of the shooting, the victim worked at Wendy's, and he was disabled because of a car accident in 2015. In May of 2017, Defendant had back surgery for a ruptured disc. The surgery took place on May 22, and Defendant remained in the hospital until May 26. Before and after the surgery, Defendant took prescription medication to help with pain. When released from the hospital after surgery, Defendant was prescribed Roxicodone and Flexeril for pain. Defendant testified that he had to walk with a walker and a cane, and that the victim had to "basically" help him the whole time.

On June 2, Defendant testified that he and the victim had the kindergarten graduation to attend. Defendant testified that he and the victim went to the graduation in different vehicles. When asked if he needed any help to attend the graduation, Defendant responded, "Prescription drugs and a cane---a walker." According to Defendant, he did not attend the party in the fellowship hall after graduation because the victim fixed a plate of food for him to take home and go rest. Defendant testified that he went straight home, and the victim arrived later with his plate of food. Defendant testified the victim gave him the food so that he could take his medication; she then packed clothes for the kids, and then the victim left with them. Although Defendant did not remember the exact time the victim left, he

remembered that it was "just gettin[g] dark." Defendant testified that after the victim left, he ate, took his medication, and went to sleep. Defendant named the medication he took as muscle relaxers, Flexerill and Roxicodone, Roxies. According to Defendant, he was dressed for bed—basketball shorts, a robe, and a muscle shirt; and he slept on the sofa in the living room. Defendant testified that he "slept directly in front of the door." Defendant estimated that he arrived home from the graduation around 7:00 p.m. or 7:30 p.m. and did not leave the house again that evening.

When asked if he owned the firearm introduced into evidence at trial, Defendant replied that he bought it from Dupuis's Pawn Shop. Defendant testified that he slept with the gun in his robe and that it was in his robe pocket on the evening of the incident. Defense counsel asked Defendant if he ever heard his wife's voice again that evening, and Defendant replied that the last time he spoke to her was when she left after she fed him and went to Buffalo Wild Wings. When asked if he heard any noises around his house that evening, Defendant testified that around 9:00 p.m. "[a]pparently someone had knocked on the door but then they stopped." Thinking it may have been the victim, Defendant called her phone several times, but there was no answer. Defendant thought the victim may have left her phone in the car or the restaurant, but he did not know where it was.

Before he went to sleep that evening, Defendant put a chair behind the front and back doors. Defendant also locked the front door. When asked why he placed a chair behind the door, Defendant explained that someone had broken into the house before. Defendant wanted to be able to hear them if it happened again. There was a movie playing on his television, but that Defendant stated, he was not watching it. Defendant testified that the medication he took made him drowsy and caused him to go in and out of sleep.

21

When shown pictures of his broken front door, Defendant testified that the door was not in that condition when he went to sleep. Defendant claimed the door was closed with the chair underneath the lock. According to Defendant, he did not hear the victim beating on the door and asking to be let in. When asked if he became aware that someone was in his house, Defendant answered:

A. At one point in time when I woke up someone was "runnin" towards me.

Q. Someone was running towards you?

A. Or power "walkin" or "somethin". They were "comin" fast.

Q. They were walking fast in your direction?

A. Yes, from either the door entry or master bedroom, which is right next to each other.

Q. So, from one of those directions someone came up on you walking fast?

A. Correct.

Q. And that was the first time that you realized that there was someone in the house?

A. Correct.

As for the broken door, Defendant testified that he was not aware of the door being forced open but later became aware that the door had been broken. When he woke up to the person walking toward him, Defendant claimed the lights were off, the television was dim, and the room was dark. Defendant claimed that he was frightened by the person walking toward him since he remembered going to sleep alone in a locked house. When he first awoke and noticed someone there, Defendant testified, he reached into his robe and fired the gun from a sitting position on the sofa. After the person fell to the ground, Defendant got up, turned on the lights, and saw that the person was his wife. Defendant stated that he immediately called 911.

22

When asked if he remembered how many shots were fired from the gun, Defendant replied that he "basically" emptied the gun because he did not know who the person was or whether they had a weapon. Defense counsel concluded his questioning of Defendant as follows:

> Q. On the early morning hours of June 3, 2017, did you intend to kill your wife?
>
> A. No, sir.
>
> Q. Did you intend to protect yourself from someone---an unknown figure that you found in your house?
>
> A. Yes, sir.
>
> Q. It was a terrible, terrible mistake, right?
>
> A. Correct.

On cross-examination, Defendant agreed the phone introduced into evidence and found at his home was his phone. The State questioned Defendant as to why he testified that the reason he knew the victim did not have her cell phone was because he called her but also texted Ms. Boutte that the victim left her phone at home. Defendant testified that he was just guessing and trying to get Ms. Boutte to tell him where "it" was. When the State asked if he was complaining to Ms. Boutte about how the victim was not taking care of him, Defendant replied, "We were 'clownin' back and forth." The following colloquy ensued:

> Q. You're joking to her mother at midnight and accusing her of making---your wife making your pain worse the last few days? That's a joke?
>
> A. We have that type of---well, had that type of relationship.
>
> Q. Oh, you did? Okay. You said you slept on the sofa.
>
> A. Correct.
>
> Q. After you shot and killed your wife did you turn off the TV in that room?

23

A.     Ummm, I don't recall.  This is four---

Q.     You don't recall?

A.     ---this was four years ago.  I don't remember.

. . . .

Q.     Okay.  You said you put a chair behind the knob on the door on the back door.  Is that correct?

A.     Yes, sir.

Q.     Isn't that pretty ridiculous if it pushes out?  A chair under a door that opens out is not going to prevent anybody from coming in, will it?

A.     The door opens in.

. . . .

Q.     Uhm, so you didn't hear your wife break through the door when you're sleeping right next to the door, right?

A.     I was on too much medication.

Q.     The question is you didn't hear that?

A.     No.

Q.     Alright.  What did you hear to make you wake up to see this person coming fast to you, because she didn't have shoes on, she was barefoot?

A.     She's two hundred and fifty---

Q.     I'm sorry?

A.     She's two hundred and fifty-two pounds.  I heard "stumpin", like someone was "comin" towards me really fast.

Q.     Why did you feel it necessary to shoot her five times and expend every bullet, every cartridge in that gun?  It contains sever [sic] cartridges and there was seven spent cartridges on the floor in your living room.

A.     Have you ever had anyone break into your house?

Defendant denied telling Mr. Moten that he had taken the victim's gun away

from her and claimed that he did not communicate with either Mr. Moten or Ms.

24

Texada. Defendant testified that they were "not friends like that." Likewise, Defendant denied telling Ms. Texada that he was going to "kill that bitch" and denied telling anyone that he was going to "kill that bitch and her mother." When asked why he took the victim's key off of her key ring, Defendant stated that he never touched the victim's keys. As for the victim's cell phone, Defendant denied removing the phone from the house. When asked why the police could not find his wife's cell phone, Defendant responded that the house was a mess and that maybe the police did not look good enough.

When asked why he left the house, Defendant responded:

A.     Alright, where I park it is opposite of a very soft spot in the grass---was a lot of mud. After the incident I tried to pull the truck up to the door and it took---that I can take her to the hospital, but none of that worked because I had forty-three staples in my back and I couldn't even bend over. The cops, to me, was "takin" too long and I thought I could help so I just left the flashers on so they could see where we were.

Q.     You did drive around the block?

A.     I came up---when I come---I "git" stuck in the mud. To avoid from "hittin" my other car or Mr. Ned's house I have to drive all the way out because the truck is "fishtailin" "comin" out. So, I go around and come back and go straight, directly in front of the doorsteps "thinkin" I can help put her in the car, but when I "git" in the house I couldn't---no.

Q.     Well, this is before you called 9-1-1, is that correct?

A.     No, this is---I already called 9-1-1.

Q.     Well, if you called 9-1-1 weren't you expecting them to bring somebody---the ambulance?

A.     Have you ever seen someone you love on the ground?

Q.     That's not the answer to my question, Mr. McNaulty [sic]. Did you expect them---the 9-1-1 people to send medical personnel?

A.     Yes, sir, I am.

Q.     So, you're telling this jury you didn't hear your wife break the door to get into the house?

25

Q.     No, sir.

Q.     You didn't hear her going to the kitchen and put leftovers in the kitchen---in the refrigerator?

A.     Absolutely not.

Q.     Yes or not [sic].  Okay.  You didn't hear her take your child and give it a bath?

A.     No, sir.

Q.     You didn't hear her put that child in the bed, wrap it up and swaddle it?

A.     No, sir.

When asked how big the house was, Defendant responded that it is not big at all – a master bedroom, living room, kitchen and two bedrooms.  Defendant testified that he never heard the victim move around in the house until she was coming at him.

Defendant did not remember if the victim went down after the first shot, but claimed he only shot the "intruder" when they were "up."  Additionally, Defendant testified that he shot every round from a sitting position.  The following colloquy ensued:

Q.     I'm going to put on the overhead projector State 2A.  I'm going to show it this way.  Did you hear Dr. Tape say that there was a bullet wound at the top of her shoulder and it exited her back?

A.     Yes, sir.

          . . . .

Q.     If you were shooting sitting down can you explain to the jury how that would have happened?

A.     I'm tall.

Defendant testified that he assumed the victim was not coming back home when she packed clothes before she left after bringing food home to him.  In further

26

explanation, Defendant claimed that he knew for sure that she had packed clothes for the kids but did not dig into the bags to make sure.

Defendant agreed that they had been having domestic trouble but claimed he had not seen divorce papers. Upon further questioning, Defendant admitted that he saw divorce papers for the first time when a discovery pack was delivered to him when he was in jail. Defendant agreed that the victim never told him she was filing for divorce.

The Defense rested, and the State recalled Sergeant Harris as a rebuttal witness. Sergeant Harris testified that he carefully examined Defendant's residence. According to Sergeant Harris, there was not a chair under the doorknob of the kitchen door. Furthermore, Sergeant Harris testified, a chair would have been ineffective since the kitchen door swung outward while the door to the living room opened inward. Sergeant Harris also testified that when he arrived at the residence, there was a television on in the master bedroom but not in the living room. The sofa, Sergeant Harris testified, was ten feet from the front door.

According to Sergeant Harris, there was a black chair to the side of the front door, but it had no damage to it, and there was no chair near the back door. Sergeant Harris observed what appeared to be a bullet hole underneath the rug in the living room, but he did not find a projectile under the house due to the muddy and watery conditions. According to Sergeant Harris, the bullet hole would have been right where the victim was lying on the floor. Additionally, Sergeant Harris observed a bullet hole through the living room window of Defendant's residence. Although the door panel of Defendant's SUV had been penetrated, the projectile was not found.

On cross-examination, Sergeant Harris testified that the back door of Defendant's residence was closed when he arrived, but he did not recall if it was

27

locked. Sergeant Harris agreed that the only door that was inspected and photographed was the front door, which showed damage from a forced entry.

Major Guidry was recalled by the State on rebuttal and testified that the first call received by the Opelousas Police Department from Defendant's residence was at 1:11:17 a.m. Major Guidry testified that at 1:13 a.m. Officer Simmons was assigned the call, and he arrived at the residence at 1:17:04 a.m. According to Major Guidry, during the 1:11 a.m. call, Defendant stated that his wife broke into his residence. Another call was received at 1:16 a.m. but was transferred to the Opelousas Police Department from 911.

Jude Moreau ("Mr. Moreau"), Executive Director of the St. Landry Parish Communications District, testified that he was the records custodian for 911. Mr. Moreau produced two 911 records from June 3, 2017. The recordings were introduced into evidence and played for the jury. According to the transcript, the recordings were inaudible.

At trial, Mr. Moreau explained why the first 911 call was repeated during the first recording. Additionally, Mr. Moreau explained why there may be a discrepancy in the times recorded for the 911 calls. On cross- examination, Mr. Moreau agreed with defense counsel's summation of the 911 calls:

Q. So, in any case, there were two calls to 9-1-1.

A. Yes, sir.

Q. Both about something happening on East Street and the second call---the first call was at 1:08---some where's earlier---and then some six minutes later at 01:14 the person calls back again and says please hurry up on this?

A. That's pretty much it, yes.

28

# DISCUSSION

In his brief to this court, Defendant contends he was legally allowed to shoot and kill any person who made an unlawful entry into his house. Defendant further contends that he mistook his wife for an intruder. Citing La.R.S. 14:16,[1] Defendant argues that his mistake constituted a "reasonable ignorance of fact" or "mistake of fact," defeating the element of specific intent.

---

[1] Louisiana Revised Statutes 14:16 provides that "reasonable ignorance of fact or mistake of fact which precludes the presence of any mental element required in that crime is a defense to any prosecution for that crime." Commenting in part on La.R.S. 14:16 in *State v. Cheatwood*, 458 So.2d 907, 910 (La.1984), the court stated at n. 4 (*emphasis in original*):

> In *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Court said:
>> "[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which defendant is charged. Proof of the non-existence of all affirmative defenses has never been constitutionally required ...." 97 S.Ct. at 2327.

> Except in a few specific instances, such as La.R.S. 14:63 (trespassing), La.R.S. 14:69 (possession of stolen property) and La.R.S. 14:14 (insanity), Louisiana statutory criminal law does not directly address the burden of proof for "defenses". Nevertheless, there is a logical distinction between those defenses which actually defeat an essential *element* of the offense and those defenses which present exculpatory circumstances that defeat culpability, despite the state's proof beyond a reasonable doubt of all the essential elements.

> In the first category are defenses such as intoxication (La.R.S. 14:15) and mistake of fact (La.R.S. 14:16), which preclude the presence of a mental element of the offense. When such defenses are raised by the evidence, the state must overcome the defense by evidence which proves beyond a reasonable doubt that the mental element was present despite the alleged intoxication or mistake of fact. Otherwise, the state would fail to meet its constitutional and statutory burden of proving guilt beyond a reasonable doubt of each element of the offense charged. La. Const. Art. I § 16 (1974); La.C.Cr.P. Art. 804; La.R.S. 15:271. However, defenses such as justification (La.R.S. 14:18) are truly "affirmative" defenses, because they do not negate any element of the offense. Compare *United States v. Mitchell,* 725 F.2d 832 (2nd Cir.1983) with *State v. Burrow,* 293 Or. 691, 653 P.2d 226 (1982); see also Model Penal Code, Proposed First Draft No. 1, § 1.12(2) (1961).

> It is logical to conclude that the Legislature intended to require the state to prove beyond a reasonable doubt only the elements of the offense and to require defendant to prove by preponderance of evidence the exculpatory circumstances constituting the "affirmative" defense. See W. Lafave & A. Scott, Criminal Law § 8 (1972). The statutory provisions setting forth the state's burden of proof refer only to the requirement that the state *prove* the elements of the crime- not that the state disprove the exculpatory circumstances constituting defenses which defeat criminal culpability despite proof of the presence of all elements of the offense. See La.R.S. 15:271; La.C.Cr.P. Art. 804; former La.C.Cr.P. Arts. 263 and 387 (1928). See also *State v. Freeman,* 427 So.2d 1161 (La.1983), Lemmon, J., concurring.

Defendant cites several facts in support of his claim. First, he claims that he was not simply asleep when his wife arrived home but sedated on heavy medications because of severe pain from too much activity following his back surgery. Defendant asserts that his text conversation with Ms. Boutte was evidence of Defendant's sedated state as the conversation was disjointed and incoherent in some parts. Even though Defendant complained in some of the text messages about his wife not taking care of him, Defendant ended the conversation, appellate counsel notes, with a message that he still loved his wife. Appellate counsel also notes that Defendant did not acknowledge Ms. Boutte's text message that the victim was on her way home, indicating that he was incoherent and fell asleep. Because it is not clear what time the victim arrived home, Defendant contends that it is not clear how long he had been asleep.

Although the State theorized that Defendant purposely took the victim's house key, Defendant contends there was no evidence to support this theory. Defendant further argues that the State's theory that Defendant plotted to kill his wife as an intruder was illogical for many reasons. In particular, he argues:

> In the first place, Mr. Johnson could not have known that his wife was capable of breaking down the front door. Moreover, if Mr. Johnson were plotting to shoot his wife as an intruder, he would have shot her as she entered the house; he would not have waited for her to roam about the house, bathing the baby and so forth. If he wanted to make up a story, he could have said that he suddenly woke up when she breached the door and mistook her for a burglar. Mr. Johnson's explanation, that he did not wake up immediately, is extremely plausible considering he was in a drug-induced sleep. However, all of the noise Lashanna made eventually roused Mr. Johnson from his "medically-induced coma." Barely conscious, Mr. Johnson believed that someone had broken into his locked house. In his stupor, Mr. Johnson believed that somebody was coming at him fast. He shot at the figure in the dark not realizing that it was his wife.

Defendant counters the State's theory that he shot the victim as they were quarreling by pointing out that Mr. Ned, the next-door neighbor, did not testify that

30

he heard any quarreling. According to Defendant, there was no evidence that the couple was quarreling at the time of the shooting. Rather, Defendant contends the evidence showed the victim knew of Defendant's concern for his safety and had locked the doors since the victim attempted to call him from her mother's house to say she was coming home. Defendant asserts that if the victim had any suspicion that Defendant intended to lock her out, she would have stayed at her mother's house rather than go home so late with a baby. According to Defendant, he and his wife had marital difficulties but no evidence of domestic violence.

As for Ms. Texada's and Mr. Moten's testimonies about Defendant's threats to kill his wife and her mother, Defendant argues that even if he made the statements, they were simply idle threats. According to Defendant, even Ms. Texada and Mr. Moten testified that they did not take the threats seriously because they knew Defendant well and knew he would not kill his wife.

Attacking the State's argument that he was lying on the couch when he shot the victim from a seated position, Defendant argues:

> This premise is not supported by the testimony of Dr. Christopher Tape who conducted the autopsy. In fact, Dr. Tape testified that the trajectory of at least one of the shots, the one he labeled No. II, was in a "slightly upward" direction. In addition, Dr. Tape testified that the trajectory of the shot he labeled No. IV went across the body, *i.e.* neither upward nor downward. The doctor made clear that, although his diagram of the body showed the victim in an "anatomic position," people do not generally stand in such a position. The victim would have been moving and falling as she was being shot and so there is no way to disprove Mr. Johnson's assertion that he was seated when he fired the shots. Importantly, Dr. Tape gave no indication that the victim might have been shot by someone standing over her and shooting downward.

Finally, Defendant argues the evidence did not support the State's theory that Defendant stood over his wife and shot downward at her. Although a hole was found in the floor beneath the victim's body, no projectile was ever found. Additionally,

31

Defendant argues that if he stood over his wife and shot downward at her, there would have been a pause in the shooting while Defendant changed his position. Mr. Ned, however, did not report any pause in the sound of "firecrackers."

In conclusion, Defendant argues the jury would have believed his plausible explanation of mistaken fact if not for the "wild speculation and misdirection of the prosecutor." Alternatively, Defendant contends this court should modify the trial court's verdict to negligent homicide:

> In the present case, if the Court accepts the State's argument that Mr. Johnson should have realized his wife was returning home, the Court might find that it constituted criminal negligence for Mr. Johnson, despite his fear, to shoot at the person in the dark room without knowing for certain that the person was actually an intruder.

In its argument before us, the State contends Defendant tried unsuccessfully to convince the jury that his specific intent was vitiated by his mistaken belief that his wife was an intruder. The State argues that the jury heard Defendant's testimony, evaluated his credibility, and rejected his version of events. Summarizing the victim's activities once she arrived home, the State asserts:

> The evidence shows that the victim had to break the door open to enter her home. It also proves that prior to her murder, she had time to locate her phone; send a group text; put her leftovers in the fridge; take off her sweater, and bathe, change, and swaddle her child; and . . . put her to bed.

Considering this evidence, the State contends Defendant's story that he was asleep the entire time is implausible. The State further notes that the police managed to recover Defendant's cell phone but not the victim's phone even though the victim sent a group text just prior to her murder. Additionally, the State notes the evidence of Defendant's threats to kill the victim made to two different people within two days of the victim's murder.

32

Countering Defendant's claims of being heavily sedated, the State points out that he was able to have a coherent text exchange with Ms. Boutte just prior to the victim returning home. Furthermore, Defendant was coherent enough to remember to lock the door and put a chair in front of it; coherent enough to aim and hit a target just after waking from a deep sleep; coherent enough to drive his vehicle out of the yard and drive around for five to seven minutes after murdering his wife; and coherent enough to call for help twice after murdering his wife.

An additional inconsistency, the State asserts, was Defendant's claim that he attempted to call the victim but did not get an answer. The State argues this makes no sense considering Defendant's text to Ms. Boutte at 11:47 p.m., informing Ms. Boutte that the victim left her phone at home. The State also notes the inconsistency between Defendant's claim that he shot the victim from a seated position and the evidence that Defendant shot the victim while he was standing directly over her.

Finally, the State argues that Mr. Ned's testimony that Defendant left the residence for five to seven minutes indicates Defendant had time to discard the victim's cell phone and "concoct his preposterous story." The State concludes its brief as follows:

> Appellant's timeline and version [of] events are fraught with internal conflicts and directly conflict with the laws of physics and the testimony of other witnesses. The jury heard Appellant's preposterous story and did not believe it. A reviewing court must give deference to the jury's review of the evidence, findings of fact and weighing of evidence. The appellate court does not assess the credibility of witnesses and reweigh[] evidence. Clearly, the jury found Appellant's testimony and version of events incredible and unbelievable and their findings should not be disturbed on appeal.

## LAW AND ANALYSIS

As we begin our analysis of the record and consideration of the arguments of counsel, we are reminded that "[s]pecific criminal intent is that state of mind which

33

exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Such state of mind can be formed in an instant[.]" *State v. Cousan,* 94-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390; *State v. Maxey*, 527 So.2d 551, 555 (La.App. 3 Cir. 1988), *writ denied,* 541 So.2d 868 (La.1989). "Due to the difficulty of presenting direct evidence as to the defendant's state of mind, the trier of fact may infer intent from the facts and circumstances of a transaction and the defendant's actions." *State v. Landry*, 08-1553, p. 17 (La.App. 1 Cir. 5/8/09), 15 So.3d 138, 149. "The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact." *State v. Nixon,* 17-1582, p. 23 (La.App. 1 Cir. 4/13/18), 250 So.3d 273, 290, *writ denied,* 18-770 (La. 11/14/18), 256 So.3d 290.

In *State v. Williams*, 93-2707 (La. 3/11/94), 633 So.2d 147, the supreme court addressed a claim that Williams shot his wife accidentally. The jury rejected Williams's claim and found him guilty of second degree murder. The fourth circuit, however, reversed Williams's conviction, finding the evidence did not support the jury's verdict. Finding the jury reasonably rejected Williams's hypothesis of innocence, the supreme court reinstated the jury's verdict. In deciding to reinstate the jury verdict, the court reasoned as follows:

> Motive is not an essential element of murder, but "a lack of motive may properly be considered as a circumstance mitigating against specific intent." *State v. Mart,* 352 So.2d 678, 681 (La.1977). Moreover, while the defendant's conflicting explanations of the shooting may have undercut the credibility of his trial testimony, they did not alone constitute affirmative substantive evidence of his specific intent to kill. *State v. Savoy,* 418 So.2d 547 (La.1982).

> The state's case for specific intent homicide rested, however, on more than the inferences arising from the conflicting statements given by the defendant. The prosecution's physical evidence directly contradicted the final, exculpatory account of an accidental shooting offered by the defendant at trial. *Compare State v. Savoy, supra.* The findings of the pathologist gave jurors a rational basis for concluding

34

that the gun could not have discharged in the way that the defendant described and that considerable, deliberate care had been taken to position the weapon exactly in the center of the victim's forehead and precisely level just before it fired. From that objective evidence, and without any other evidence of his intent but the defendant's discredited version of an accidental shooting, jurors could rationally infer that he fired a bullet through the brain of his victim with the specific intent to kill her. *Cf., State v. Williams,* 383 So.2d 369 (La.1980); *State v. Procell,* 365 So.2d 484 (La.1978).

In *State v. Captville,* 448 So.2d 676, 680 (La.1984), this Court explained that "[w]hen a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." In *Captville,* the state also failed to present any evidence of motive underlying the death of the defendant's wife. This Court nevertheless concluded that "[t]he jury's verdict reflected a reasonable construction of the events of the evening based upon the evidence viewed in the light most favorable to the prosecution." *Id.,* 448 So.2d at 680.

In this case, the state's theory of the case provided jurors a reasonable reconstruction of the events surrounding the victim's death consistent with all of the evidence; that for whatever reason, and no matter how much he had come to regret his actions immediately afterward, the defendant deliberately put a gun to his wife's forehead and shot her at point-blank range with a .38 caliber revolver. By comparison, the defendant's exculpatory account of the shooting appeared so remote and unlikely that it failed to provide jurors a hypothesis of innocence they could not reasonably reject.

*Williams,* 633 So.2d at 149.

Likewise, after carefully reviewing the record, we find the jury reasonably rejected Defendant's hypothesis of innocence in the present case. In addition to Defendant's threats to kill the victim shortly before the murder, Defendant's version of events is implausible considering the physical evidence. Defendant's last text to Ms. Boutte was at 12:18 a.m. Since the victim texted her friends at 12:50 a.m., she must have already been in the house at that time. Thus, the victim was beating on the door and yelling at Defendant to let her in within thirty minutes of Defendant's last text to Ms. Boutte and only about ten feet away from where Defendant claimed

to be sleeping. Additionally, Mr. Ned saw Defendant back up to his front door and drive off for about five to seven minutes, all of which happened before the police arrived at 1:17 a.m. Thus, it was not irrational for the jury to conclude that Defendant was not in a sleep so deep that he was unable to hear the victim beating on the door and hollering and unable to hear her activities once she entered the trailer. Considering the record evidence outlined above, we find the jury's decision was reasonable and the evidence, when viewed in the light most favorable to the prosecution, fully supports the jury verdict.

Defendant was tried for second degree murder by a twelve-member jury of his peers, and the jury returned a verdict of guilty as charged. Since the jury is the ultimate trier of fact, they have necessarily reached a conclusion that specific intent was present, along with all the other elements, for second degree murder.

Accordingly, we find Defendant's assignment of error lacks merit.

## DISPOSITION

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**